168

Henry Cabot Lodge BOHLER, for himself and as next friend of George Allessandro Bohler, Pamela Marie Bohler and Henry Cabot Lodge Bohler, Jr., minors, Clifford Marie Bohler, Cathryn Harris, for herself and as next friend of Reuben Harris, Ronald Harris, Reginald Harris and Kathleen Harris, minors, Ethelyn L. Williams, Levy C. Turner, for himself and as next friend of Linda Joyce Turner and Leroy Turner, minors, Herbert Bolen, for himself and as next friend of Ordrea R. Bolen and Ophelia D. Bolen, minors, on behalf of themselves and others similarly situated, residents of the City of Tampa, Florida, Plaintiffs,

v.

Julian LANE, as Mayor of the City of Tampa, Florida, a municipal corporation organized and existing under the laws of the State of Florida; Bill Myers, Fletcher Stribling, Sam Mirabella, Lee Duncan, Lloyd Copeland, W. D. West, Richard Bacon, constituting the Councilmen of the City of Tampa, Florida, a municipal corporation organized under the laws of the State of Florida; Mrs. Cordelia Hunt, Wesley H. Hamiter, Dr. Albert Rodriguez, Miss Marcella Hanley, Donald Shreve, Robert Benjamin Lane, constituting the Head of the Department of Recreation and members of the Board of Recreation of the City of Tampa; Frank Neff, Dr. W. M. Rowlett, Mrs. Peter O. Knight, Jr., E. M. Groff, Mrs. Eliot C. Fletcher, Mrs. William E. Davis, constituting the Superintendent of Parks, Chairman of the Park Board and members of the Park Board of the City of Tampa, Defendants.

Civ. No. 3809.

United States District Court
S. D. Florida,
Tampa Division.
March 19, 1962.

Francisco A. Rodriguez, Tampa, Fla., for plaintiffs.

Paull E. Dixon, Robert H. Carlton, A. Broaddus Livingston, Tampa, Fla., for defendants.

LIEB, District Judge.

This is a class action filed by the named plaintiffs, seventeen (17) Negro citizens of the United States and residents of the City of Tampa, Florida, on behalf of themselves and other Negroes similarly situated, seeking a declaration of their right to use and enjoy, without regard to any discrimination based on race, the playgrounds, public parks and recreational facilities owned and operated by the defendant, City of Tampa, a municipal corporation. The seven (7) individual members of the City Commission of said city were joined as named defendants, together with the six (6) members of the Recreation Board of the Recreation Department of the defendant city and the superintendent of parks and members of the Park Board of said defendant city. The plaintiffs also seek a permanent injunction against the enforcement of certain practices, policies, customs or usage, which, according to their contention, prevented them, and other Negroes similarly situated, from using certain recreational facilities without discrimination.

The jurisdiction of this Court is invoked pursuant to Title 28 U.S.C.A. § 1343(3), and Title 42 U.S.C.A. § 1983 (Civil Rights Act), and also as to the declaratory relief pursuant to Title 28 U.S.C.A. § 2201 and § 2202.

Although this controversy involves primarily certain incidents which took place at Lowry Park and Jackson Heights Playground, the complaint recites numerous other parks by name, which the plaintiffs contend were at the are, designated by the defendants for the exclusive use of White citizens and time of the filing of this action, and still consequently they are prohibited and prevented from using said parks and playgrounds on an equal basis with the White citizens.

The defendants, in their answer to the complaint, deny that the parks and playgrounds set forth in the complaint have any designation for the exclusive use of White citizens and deny that the plaintiffs were prohibited from using the facilities of Lowry Park as alleged in the complaint on the basis of any policy of segregation pursued and enforced by it; defendants admit, however, that the Park Board of the City announced a plan to open Lowry Park and Fairyland for the use of all citizens, but that the Mayor of the city ordered a cessation of said Park Board plan, but they deny the reasons for said cessation as alleged in the complaint; defendants admit that the plaintiffs filed a petition on February 2, 1960, to open Lowry Park for the use of Negroes, and they deny that the alleged grievance now remains in practice.

Pursuant to stipulation entered into herein by and between the parties at the time of the final hearing, the Ballast Point Park and Pier were removed from this cause and, therefore, are excluded from any further consideration by this Court.

The evidence presented in support of the complaint reveals that on June 21, 1959, one of the plaintiffs, Henry Cabot Lodge Bohler, accompanied by his family and several other companions, visited Lowry Park, one of the parks involved in this litigation. Approximately twenty-five (25) minutes after their arrival, a

police officer and a park attendant in charge of Lowry Park came up to them and requested them to leave. The Negroes demanded an explanation as to why they were not permitted to remain on the premises, but they were informed without any further explanation that they had to leave or they would be arrested. The Negroes complied and left said park immediately.

On the following day, the plaintiff, Henry Cabot Lodge Bohler, accompanied by a local Negro citizen named Banfield, went to see the Chief of Police for the purpose of finding out under what authority they had been requested to leave the park by the police officer in question. The Police Chief informed them that the policeman was within his rights and that they could have been arrested had they not complied with his request. When pressed for specific authority or statute or ordinance upon which the exclusion of Negroes might have been based, the Chief of Police said, "Well, we would arrest you first and then we could find charges later."

Banfield, in the month of September, 1959, again visited Lowry Park with his family, and shortly after his arrival was again asked to leave, which he did.

In October, 1959, a delegation, composed of some of the plaintiffs and other Negro citizens, requested a conference with one of the defendants, Dr. Rowlett, chairman of the Park Board, and with Mr. Bradley, superintendent of parks at that time, for the purpose of discussing the park situation in the City of Tampa. At the conference the plaintiffs requested permission of the park board superintendent and members of the Park Board to use the facilities of Lowry Park and Fairyland in their entirety. Mr. Bradley stated that he felt that the parks could be opened in the very near future to Negroes, but he would have to confer with the members of the Park Board; and he promised the plaintiffs a decision in a week or two. At that conference it was suggested that an alternative plan be worked out whereby the Negroes would be allowed to use Lowry Park and Fairyland one day a week, or in the alternative one week-end each month. This suggestion was promptly rejected by the plaintiffs. This conference was conducted in an amicable atmosphere; and after discussing the best solution for the problem presented, the meeting closed with the understanding that the Park Board would come to some decision with regard to allowing Negroes to use Lowry Park and Fairyland. Before the plaintiffs left the meeting, they were assured that the matter would be taken up with counsel for the defendant city and that the Board would recommend that the park be opened to Negro citizens.

On October 8, 1959, the then recently elected Mayor of the defendant city, Julian Lane, released for publication a statement commenting on the request of the plaintiffs to open Lowry Park and Fairyland to Negro citizens, and in the press release the Mayor stated that since the group proposing the integration of Lowry Park and Fairyland would not give more time to solve the problem in the best possible fashion, he, as Mayor, had no choice but to insist that Fairyland and other park facilities in the City of Tampa *continue* their operation on a segregated basis, as they had in the past, and the city would use such means as might be available to see that this traditional practice was maintained. This statement was widely publicized by the news media.

The next incident involving the public parks of the defendant city appearing in the record took place on July 5, 1960, when a Negro, James Levi Cole, a minor, accompanied by his brother, Anthony Cole, and his cousin, Edwin C. Hill, and some other Negro minors, visited Jackson Heights Playground. Shortly after their arrival, an employee of the defendant city, in charge of the playground, asked them to leave, stating that inasmuch as this matter was in Court under litigation, and the Court had not determined the matter, they would have to leave; otherwise they would be arrested. They promptly complied with this re-

quest. The Cole children returned to the park about 2:00 p. m., accompanied by their mother, Mrs. Madelyne Cole, but on arrival the park attendant asked them to leave, stating that it was a White park; and they were told that they had better leave immediately or the police would be called. They refused to leave, however, upon the advice of Mrs. Cole; whereupon some city policemen, who came to the park pursuant to a call, ordered the park to be closed. The park remained closed for the balance of the afternoon, and there were no further incidents on that date.

On the following morning, July 6, at about 9:00 a. m., a large group of Negro children, including James Levi Cole, Anthony Cole and Edwin C. Hill, came back to the same playground and started to play basketball on a basketball court. A group of White children were playing in a nearby baseball diamond; and these White children, after they realized the presence of the Negro children, began knocking the baseball over to the basketball court. When it appeared that the Negro children would not abandon the basketball court, the White children came over to the basketball court with brooms, tools and rakes and told the Negro children that they would have to "clean the court off" and asked them to leave. The Negro children left the basketball court and went to the baseball diamond. The White children promptly followed them, and the same routine occurred again. The situation soon became tense, and a large group of people—both Negro and White—commenced to gather, when an employee of the defendant city by telephone summoned the Chief of Police, who arrived on the scene shortly thereafter. The employee in charge of the park, after consulting with the Chief of Police, announced that the park would be closed immediately in order to avoid a riot, and the Chief of Police ordered the crowd to disperse. At the time of the arrival of the Chief of Police, several other patrolmen arrived on the scene and the crowd rapidly grew in size. Rev. Lowry, who is the head of the local branch of the N. A. A. C. P., also arrived at the scene pursuant to a telephone call; and realizing the gravity of the situation, he advised the Negro children, and the bystanders, to disperse and leave the scene. After the dispersal of the crowd, the park remained closed for a few hours.

The next incident revealed by the record took place on April 22, 1961, when Levy C. Turner, one of the named plaintiffs, in the company of nine (9) other adult Negroes, visited Lowry Park. They arrived at the park about 2:30 o'clock in the afternoon and spent about 45 minutes without being disturbed by anyone. No one asked them to leave at any time; and they freely took in the sights at the park, visiting the zoo and using the facilities of said park. When the plaintiff, Levy C. Turner, attempted to buy a soda at the concession stand, however, he was unsuccessful due to the reluctance of the attendant at the concession stand to sell him anything. Plaintiff Turner remained at the stand, however, purportedly waiting for service. One of the girls in the Turner party went over to the ticket office and attempted to purchase a ticket for one of the rides. She was equally unsuccessful because the girl at the ticket office would not sell her a ticket. When the Negroes refused to move, one of the park attendants called a uniformed patrolman of the defendant city, who ordered the Negroes to move and told them that they would be arrested unless they complied with this order. In the meantime, Mr. Frank Neff, the superintendent of parks and cemeteries of the defendant city, was summoned to the scene by one of the park attendants. He arrived shortly and found a group of White and Negro adults gathered near the concession stand; and he promptly caused a public announcement to be made, through the public address system of the park, that the park would be closed immediately; and he ordered the park to be closed and instructed all individuals who were in the park, White and Negro, to leave the park at once. The park was cleared promptly, without any further incident.

As a result of the last incident, and shortly thereafter, the park superintendent called a meeting of the concessionaires concerning the service to Negroes at the city parks, and instructed them to serve all individuals and sell tickets for the rides regardless of race, creed or color.

The bi-racial committee appointed by the Mayor shortly after he took office in October, 1959, held several meetings for the purpose of working out a satisfactory and amicable solution to the problems with regard to the use and enjoyment of the public parks and recreational facilities by Negro citizens of the defendant city on an equal basis with its White citizens. The evidence indicates that, although there was never a concrete decision announced as to any change in policy, Negro citizens did visit some of the city parks and were not molested or prevented at any time from doing so.

The evidence also reveals that the Mayor instructed the superintendent of parks that Negro citizens were to be welcome in the parks so long as they came peacefully and for the purpose of rest and relaxation, but demonstrations were not to be permitted in the parks. The record also contains several admissions by the defendant city, which were made pursuant to requests for admissions in the course of pre-trial discovery, together with certain answers filed by it pursuant to written interrogatories proposed by the plaintiffs, which reveal that the public parks and playgrounds recited in the complaint were, in fact, used exclusively by Whites; but the evidence is clear that there was no ordinance, or statute, of any kind which compelled segregation of races in the parks and playgrounds of the City of Tampa. The evidence further indicates that the Board of Commissioners of the defendant city recommended against opening up the parks, playgrounds and recreational facilities to the Negro citizens on an equal basis with the White citizens of the community because the parks, playgrounds and recreational facilities in question did not have separate toilet facilities which is a requirement under the regulations promulgated by the State Board of Health, although the record is void of any proof of the existence of such requirement.

■ It is, of course, now settled beyond any legitimate dispute that enforced racial segregation in the public parks of a city is unconstitutional and in violation of the equal protection clause of the Federal Constitution. (See Gilmore v. City of Montgomery, Ala., D.C., 176 F.Supp. 776; City of Montgomery, Ala., v. Gilmore, 277 F.2d 364, 5 C.C.A.; Holmes v. City of Atlanta, D.C.N.D.Ga. 1954, 124 F.Supp. 290, affirmed 5 Cir., 1955, 223 F.2d 93, reversed 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776; Dawson v. Mayor and City Council of Baltimore City, 4 Cir., 1955, 220 F.2d 386, affirmed 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774; Department of Conservation & Development, Division of Parks, Com. of Va. v. Tate, 4 Cir., 1956, 231 F.2d 615, affirmed 352 U.S. 838, 77 S.Ct. 58, 1 L. Ed.2d 56; Fayson v. Beard, D.C.E.D. Tex.1955, 134 F.Supp. 379; City of St. Petersburg v. Alsup, 5 Cir., 1956, 238 F. 2d 830; Ward v. City of Miami, Fla., D.C.S.D.Fla.1957, 151 F.Supp. 593; Moorhead v. City of Fort Lauderdale, D.C.S.D.Fla.1957, 152 F.Supp. 131, affirmed 5 Cir., 1957, 248 F.2d 544.)

■ It is also settled that segregation cannot be justified as a means of preserving the public peace merely because the tangible facilities furnished to one race are equal to those furnished to the other (Fayson v. Beard, supra), and racial segregation in recreational activities can no longer be sustained as the proper exercise of the police power of the state if it is used as a tool to perpetuate segregation of citizens based on race. The constitutional mandate, which absolutely and unconditionally prohibits segregation of races by compulsion, cannot be frustrated on the ground that friction might arise if the parks, playgrounds and recreational facilities· are open on an equal basis to the White and Negro citizens alike. State regulations requiring use of separate toilet facilities

by Negroes and Whites in public places are also contrary to, and in violation of, the equal protection clause of the Fourteenth Amendment; and the fact that the parks, playgrounds and recreational facilities are not equipped with such separate toilet facilities is, of course, no excuse for denying to the Negro citizens of the community their unconditional right to use and enjoy the parks, playgrounds and recreational facilities operated by the defendant city, on an equal basis with the White citizens and residents of the defendant city.

██ However, it is clear that the defendant city is not only entitled, but has the duty, to use every legitimate means to assure public peace and tranquility and also to assure that the parks, playgrounds and recreational facilities are used for the purpose for which they were intended, to-wit, for recreation, relaxation and rest, and not for demonstrations. While a city cannot constitutionally use the purported exercise of its police powers as a subterfuge for maintaining segregation, a city is entitled to preserve the peace and assure a peaceful enjoyment of the parks to all races, regardless of which group of citizens, Negro or White, causes disturbances. The plaintiffs' constitutional right to use and enjoy the parks, playgrounds and recreational facilities on an equal basis with the White citizens in the community does not encompass a right to cause a disturbance, thereby infringing upon the rights of others to peacefully enjoy and use said parks, playgrounds and recreational facilities.

██ The defendants do not challenge the legal principles just stated; and they concede now, as they must, that they cannot operate public parks, playgrounds and recreational facilities on a racially segregated basis without violating the equal protection clause of the Fourteenth Amendment. They contend, however, that there is no case or pending controversy between the parties and that, therefore, this Court should dismiss this suit since the existence of an actual case or controversy is a jurisdictional prerequisite to the granting of *any* relief. This contention is patently without merit. The evidence is uncontradicted that, at the time of the institution of this action, the publicly announced policy of the defendant city with regard to the operation of parks, playgrounds and recreational facilities was to assign certain parks, playgrounds and recreational facilities for the exclusive use of the White citizens of the community, and to assign certain parks, playgrounds and recreational facilities for the exclusive use of the Negro citizens. It further appears that at the time of the institution of this action it was the announced intention of the defendant city to continue to operate said parks, playgrounds and recreational facilities on a racially segregated basis. The plan suggested by the defendants to allow the Negro citizens to use Lowry Park on a once-a-week basis further buttresses the contention that the parks, playgrounds and recreational facilities were, in fact, operated largely on a segregated basis. The statement of the chairman of the Park Board, that they could not open Lowry Park to the Negro citizens due to the lack of separate toilet facilities, also clearly establishes that at the time of the institution of this action, and even during the pendency of this litigation, at least for some time, the parks, playgrounds and recreational facilities were, in fact, operated on a racially segregated basis. Even if the incidents of exclusion of the plaintiffs, and some other Negro citizens similarly situated, could be explained on the basis that they were excluded solely in order to prevent a riot and disturbance at the time and place involved in said incidents, this explanation is not very well substantiated by the record with the possible exception of the Jackson Heights playground incident.

██ Consideration of the evidence in toto compels the conclusion that the parks, playgrounds and recreational facilities of the City of Tampa were, in fact, operated on a racially segregated

174

basis at the time this action was instituted.

The Court has jurisdiction of this cause; and the plaintiffs are entitled to a declaration by this Court of their unconditional and absolute right to use and enjoy the parks, playgrounds and recreational facilities of the defendant city as they are listed in the complaint, with the exception of the Ballast Point Park and Pier, on an equal basis with the White citizens and residents of the defendant city.

■ With regard to the prayer for injunctive relief, it is well to state that ordinarily there is no absolute right to an injunction; and the remedy being an equitable one, it must be granted or denied in accordance with the sound established principles of equity jurisdiction. (Gilmore v. City of Montgomery, Ala., supra.) In considering this phase of the case, it is well to keep in mind the admonition stated by the Fifth Circuit Court of Appeals in the case of Avery v. Wichita Falls Independent School Dist., 5 Cir., 241 F.2d 230, citing the case of Briggs v. Elliott, D.C.E.D.S.C., 132 F. Supp. 776, 777, as follows:

"'* * * it is important that we point out exactly what the Supreme Court has decided and what it has not decided in this case. It has not decided that the federal courts are to take over or regulate the public schools of the states. It has not decided that the states must mix persons of different races in the schools or must require them to attend schools or must deprive them of the right of choosing the schools they attend. What it has decided, and all that it has decided, is that a state may not deny to any person on account of race the right to attend any school that it maintains. This, under the decision of the Supreme Court, the state may not do directly or indirectly; but if the schools which it maintains are open to children of all races, no violation of the Constitution is involved even though the children of different races voluntarily attend different schools, as they attend different churches. Nothing in the Constitution or in the decision of the Supreme Court takes away from the people freedom to choose the schools they attend. The Constitution, in other words, does not require integration. It merely forbids discrimination. It does not forbid such segregation as occurs as the result of voluntary action. It merely forbids the use of governmental power to enforce segregation. The Fourteenth Amendment is a limitation upon the exercise of power by the state or state agencies, not a limitation upon the freedom of individuals.'"

These principles are equally applicable to cases involving parks, playgrounds and recreational facilities. As stated by Chief Judge Rives of the Fifth Circuit, speaking for the Court in the case of City of Montgomery, Alabama, v. Gilmore, supra, a public park case, "Neither the Fifth nor the Fourteenth Amendment operates positively to command integration of the races but only negatively to forbid governmentally enforced segregation."

A voluntary cessation of an illegal conduct does not render a case moot. The Court is still required to consider the case and controversy presented, and to consider the grant of the prayer for declaratory relief. However, the cessation of the illegal conduct, if it is established, might render the granting of the injunction prayed for unnecessary, unjust and inequitable; and it might cause harm and thwart the ultimate goal which it aims to accomplish, to-wit, the elimination of racial discrimination in the operation of public parks, playgrounds and recreational facilities.

The evidence presented in support of the prayer for injunctive relief does not bear out the contention that the parks, playgrounds and recreational facilities are still operated on a racially segregated basis. The Court is satisfied that the elected officials of the defendant city

fully realize their obligation to adhere to the Federal Constitution; and this Court will not presume that they will not obey the mandate to operate the parks, playgrounds and recreational facilities on a racially unsegregated basis. The evidence indicates that the superintendent of the parks is now instructed by the Mayor of the defendant city to permit the Negro citizens of the community to use and enjoy the parks, playgrounds and recreational facilities of the city on an equal basis with the White citizens of the community. The evidence further indicates that the superintendent of parks did instruct the concessionaires, and their employees, at Lowry Park to serve and cater to all citizens without regard to race, creed or color; and he also testified that the policy of the Parks Department is that any individual regardless of race, creed or color, who comes to the park system operated by the defendant to enjoy the facilities of the park, will not be noticed or molested in any way, shape, manner or form, so long as he conducts himself in a manner becoming a gentleman.

Although there is evidence that subsequent to the institution of this action some of the plaintiffs were involved in an incident at Lowry Park, the evidence is also uncontradicted that on that occasion they were permitted to use the park for a considerable length of time and that they were not disturbed in any manner until the incident arose at the refreshment stand. Although it is the plaintiffs' contention that they were ordered to leave the park as a result of this incident, it is clear that the park was closed to all—Negro and White alike—in order to prevent the development of a disturbance which might have caused harm to the persons present on the scene.

The Court is aware, of course, that injunctions have been issued in segregation cases, even though at the time the cases were decided the parks involved were closed and were not being operated. It is noteworthy, however, that the Fifth Circuit Court of Appeals, in considering Gilmore v. City of Montgomery, Alabama, supra, on appeal, while affirming the District Court as to the declaratory relief granted by it, remanded the case with the suggestion that the injunctive relief granted by the District Court might be vacated in order to create a better atmosphere for the possible amicable solution of the park problem. The cases referred to above, where injunctions have been issued, are distinguishable in that the cities in those cases acted pursuant either to a state law which compelled racial segregation or, as in the Gilmore case, to an ordinance which declared it a misdemeanor for White and Negro persons to enter or visit, or use, public parks except those assigned to their respective races. There is no contention or proof in this case that there is any state law, or local ordinance, which was the basis of the exclusion of the Negroes from the public parks, playgrounds and recreational facilities of the defendant city; but the policy of segregation, when enforced in the past, was pursuant to custom and usage.

In the light of the scope of the relief granted herein and in the light of the lack of substantial evidence to indicate the likelihood of recurrence of these past practices, which are declared herein unconditionally and absolutely illegal and in violation of the Constitution, it is the opinion of the Court that the drastic measure of injunction is not justified. The Court, however, shall retain jurisdiction of this cause, to take such proceedings and enter such orders as may be necessary to assure plaintiffs equality of treatment with the White citizens with regard to the use and enjoyment of the parks, playgrounds and recreational facilities owned and operated by the defendant, City of Tampa.

Final Decree shall be entered in accordance with the foregoing, declaring that the plaintiffs, and other Negro residents of Tampa, have the absolute and unqualified right to use and enjoy the playgrounds, parks and recreational facilities listed in the complaint, with the exception of the Ballast Point Park and Pier, on an equal basis with the

White citizens and residents of the defendant city, but denying the prayer for permanent injunction, reserving, however, the jurisdiction of this Court to entertain said prayer, upon motion, in the event the plaintiffs' constitutional rights are in any way violated or infringed by the defendant city in connection with the operation and ownership of its parks, playgrounds and recreational facilities.

This Memorandum Opinion shall satisfy the requirements of Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A.