Virgil **WOOD** et al., Plaintiffs,

v.

William **VAUGHAN**, Mayor, et al., Defendants.

Civ. A. No. 535.

United States District Court
W. D. Virginia,
Lynchburg Division.

Sept. 14, 1962.

Len Holt, Norfolk, Va., for plaintiffs.

S. Bolling Hobbs, Lynchburg, Va., C. Shepherd Nowlin, City Atty., Lynchburg, Va., for defendants Vaughan, McKenna, Bell, Brooks, Judge Earl Wingo and J. Hundley.

Frederick T. Gray, Atty. Gen., Va., Richmond, Va., for defendants Judges Burks and Cundiff.

MICHIE, District Judge.

The plaintiffs, Virgil Wood, O. C. Thaxton and T. N. Burton, alleging that they are "citizens of the United States and of the City of Lynchburg, Virginia, and environs and are members of the so-called Negro race or the so-called African race" filed this suit designated by

them "an omnibus suit which seeks to end all racial segregation and all racial discrimination of all public facilities of the City of Lynchburg, Virginia" against William Vaughan, Mayor of Lynchburg, F. K. McKenna, Department of Parks, G. M. Bell, City Treasurer, R. O. Brooks, Chief of Police, J. Hundley, Department of Health and Welfare, Raymond Hogan, Administrator of the Lynchburg General Hospital, Judge Earl Wingo of the Municipal Court of Lynchburg, Judge O. Raymond Cundiff of the Corporation Court of Lynchburg and Judge C. Burk of the Circuit Court of Lynchburg, seeking a declaratory judgment and a temporary and permanent injunction to enjoin the defendants from discrimination on account of race in all of the public institutions of the City of Lynchburg and also to enjoin the appropriation of any public funds to any of such institutions so long as racial segregation and racial discrimination is enforced therein. The institutions specifically mentioned are the public swimming pools, the City Parks, the Lynchburg Nursing Home, the Lynchburg General Hospital, the City Jails, the city cemetery, the city Armory, the City Hall building and the municipal, corporation and circuit courts. Towards the end of the bill of complaint appear "some examples—by way of further pleadings—of racial segregation and racial discrimination in Lynchburg public institutions", to-wit, segregation by floors at the Lynchburg Nursing Home, in the swimming pools, in the rest rooms of some public facilities and in the walled portion of the City cemetery, as well as in the Lynchburg General Hospital and the Lynchburg Nursing School, with which two latter we are not here concerned for reasons that will shortly appear. In addition institutions and buildings said to be affected were elsewhere enumerated as the public swimming pools, the City Parks, the Lynchburg Nursing Home, the Lynchburg General Hospital, the City Jails, the city cemetery, the city Armory and the City Hall building and the municipal, corporation

and circuit courts. The defendants Vaughan, McKenna, Bell, Brooks, Wingo and Hundley—all officers or employees of the City of Lynchburg—filed jointly a motion to dismiss the complaint, quash the summons and for a more definite statement. The Lynchburg General Hospital and Judges Cundiff and Burks filed somewhat similar motions. And the Attorney General of Virginia filed a somewhat similar but briefer motion on behalf of Judges Cundiff and Burks.

The motion of Judges Cundiff and Burks was granted, as well as a similar motion on behalf of Judge Wingo and this action of the court has been appealed by the plaintiffs and is now pending in the Fourth Circuit Court of Appeals.

■ One of the grounds urged by the City and Hospital officials for dismissing the complaint against them was that there was a misjoinder of causes of action. I held that there was such a misjoinder.

The Lynchburg General Hospital was an independent incorporated body created under Article 1 of Chap. 13 of Title 32 of the Code of Virginia and was not subject to control by the City. After the suit was instituted the plaintiffs moved to add the Hospital itself as a party.

It seemed to me that any right that the plaintiffs might have had against Mr. Hogan and the Lynchburg General Hospital could not have arisen out of the same "transaction, occurrence, or series of transactions or occurrences" (Fed.R. Civ.P. 20, 28 U.S.C.A.) which gave rise to rights against the City and the city officials and consequently I ordered a severance of the two causes of action and I will not be further concerned with the cause of action against Mr. Hogan and the Hospital in this opinion as that severed case has not as yet been heard.

■ The plaintiffs shortly after the argument on the defendants' motion to dismiss asked leave to join the City of Lynchburg, the City Sergeant of Lynchburg and the Hospital Authority

as parties defendant and this motion was granted, except as to the City Sergeant, neither the court nor counsel either, apparently, being then familiar with the cases of Monroe v. Pape (1961), 365 U. S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 and Egan v. City of Aurora (1961), 365 U.S. 514, 81 S.Ct. 684, 5 L.Ed.2d 741 and cases in the District Courts and the Courts of Appeal following those decisions.

In Monroe v. Pape, supra, plaintiff sued the City of Chicago and other defendants for wrongfully breaking into his home in the early morning and ransacking the place without a search warrant and for inflicting various other indignities upon him.

The jurisdiction of this court is set forth as follows in 28 U.S.C.A. § 1343:

"The district courts shall have original jurisdiction of any civil action *authorized by law to be commenced by any person*:

\* \* \* \* \* \*

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

"(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote." (Emphasis supplied.)

It will be observed that the introductory portion of the section refers to "any civil action authorized by law to be commenced by any person" so. that the section itself, while defining the jurisdiction of the district courts, does not create any right on the part of any individual to sue. If he has that right it is provided that he may sue in the district court but one must look elsewhere to determine whether he has a right to sue.

Hatfield v. Bailleaux (9th Cir.1961), 290 F.2d 632.

When we look elsewhere for authorization we must turn to section 1983 of 42 U.S.C.A. which reads as follows:

"Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action .at law, suit in equity, or other proper proceeding for redress." (Emphasis supplied.)

In Monroe v. Pape, supra, the Supreme Court, held, in brief, that the City of Chicago was not a person and therefore could not be sued under the above quoted section for violation of a citizen's civil rights.

The court admitted that in certain cases before it judgments under similar circumstances had been rendered against cities but said in a footnote at page 191 of 365 U.S., 81 S.Ct. at page 486:

"The question dealt with in our opinion was not raised in those cases, either by the parties or by the Court. Since we hold that a municipal corporation is not a 'person' within the meaning of § 1983, no inference to the contrary can any longer be drawn from those cases."

Upon motion of the City, based on Monroe v. Pape, supra, and made shortly before the case was scheduled to go on trial, the court stated that the City would in due course be dismissed as a defendant.

Inasmuch as the court and counsel had originally thought the City could be held responsible for everything done by its agents, the plaintiffs had not made parties to the suit all the officials of the City who might be charged with responsibility for the various actions alleged to be contrary to the plaintiffs' civ-

il rights. Upon announcing my decision as to the dismissal of the City I stated that I would give the complainants leave to make additional parties defendants and would postpone the hearing of the case until that could be done. Counsel for the complainants however, stating that he thought my ruling as to the City was erroneous, stood on his position and declined the opportunity to add other parties. So the trial proceeded.

While the original bill of complaint was entirely devoted to alleged discriminations by city officials involving segregation of the races, in the parks, playgrounds, etc. of the City, the plaintiffs later filed a document entitled "Specificity of Segregation" which might be deemed to be somewhat in the nature of a bill of particulars though none had been asked for. This document raised questions of discrimination as between Negroes and whites in the appointment of persons to positions in the Fire and Police Departments of the City and of promotion within the latter and generally throughout the City. It also raised questions as to the selection of election officials, service at polling places, jury lists, jury commissioners, etc. The City raises the point that this document was not an amended bill of complaint, was filed without consent of court and has no official standing in the case and therefore cannot be used as a basis for raising those new points in the trial. Technically the City may be right but the matters were gone into very thoroughly at the trial and for the purposes of this opinion I shall treat the "Specificity" as a bill of particulars or amended bill of complaint.

However, by concession of counsel at the close of the taking of the evidence, it was stipulated that there was no segregation in the city cemeteries justifying injunctive relief and that with respect to employment only the Police Department, the Social Services and the Nursing Home were involved. And judging from the plaintiffs' brief they are now concerned only about promotions rather than original employment in the Police Department. And no argument is made in the brief with respect to employment in the Social Services and the Nursing Home. Counsel also conceded that they had not shown any discrimination in employment in secretarial help in the City offices and there was no mention of election officials in the evidence nor is there in the brief.

Therefore despite the numerous allegations in the original complaint and the "Specificity" it appears that we get down to a relatively small number of complaints with respect either to segregation or discrimination in employment or promotion in (1) the city Armory, (2) the City Lockup, (3) the City Swimming Pools, (4) the Nursing Home, (5) Organized Athletic Activities in the City Parks and (6) Employment and/or Promotion in the Police Department, the Social Services and the Nursing Home. These six items will be separately treated under appropriate headings.

### 1. The City Armory

Subject to the prior claim of the local National Guard, the Armory is under the general control of the City. The city government is the Council and City Manager type and consequently the Armory, when not used by the National Guard, is under the immediate control of the City Manager, subject to the ultimate control of the City Council. In the City Manager form of government in Virginia the Mayor is only a member of the City Council who has been chosen to preside at the meetings of the Council. He has no greater authority than any other single member of Council. Mayor Vaughan is the only member of the City Council who is a party to this suit and the City Manager is not a party. As noted above, when I decided that the City itself was not a proper party to the suit and must be dismissed I offered to continue the hearing of the evidence in the case to a later date in order to give the plaintiffs an opportunity to add addi-

tional parties but plaintiffs' counsel declined to accept the opportunity and insisted upon proceeding with the trial. As a result, although it would seem that there have been certain practices in effect with respect to the Armory which might have justified the issuance of an injunction against their continuance were there defendants in the case against whom such an injunction would be effective, there are no such defendants except the Mayor who has no power acting alone to change these practices. Consequently there is no defendant against whom an effective injunction with respect to the Armory could be entered. So no injunction with respect to the Armory will be entered.

### 2. The City Lockup

■ The City Lockup is in the City Hall. There are ten or twelve separate cells where drunks and other people picked up by the police, usually at night, are locked up to await trial in the Municipal Court the next morning. Plaintiffs complain that two of them were once put in the Lockup and segregated from the white prisoners, whether by being placed in a cell together or each with another colored prisoner being not quite clear from the evidence.

Chief of Police Brooks testified with respect to the Lockup as follows:

"Normally we segregate all prisoners, regardless of the race, if we have enough space. We do that principally to maintain discipline and that sort of thing. Most of the people we put in our cell blocks, detention cells, are usually intoxicated. We hold them against their will to start with. We don't put even white prisoners together if we can help it until they are sober. If we fill up, we do the best we can. It doesn't happen very often. We don't integrate prisoners regardless of race in a drunken condition and expect any semblance of discipline in the cell block.

"Q I gather any segregation that is done is a disciplinary measure, is that correct?

"A Absolutely; yes, sir.

\*      \*      \*      \*      \*      \*

"Q Now, regarding the lockup, you indicate that if possible you put each person locked up in a separate cell.

"A That is true.

\*      \*      \*      \*      \*      \*

"Q What orders have you issued as to placing of prisoners, if at all?

"A To put them where you would not have two drunks together.

"Q You have no restrictions against white persons and negroes being in a cell together, if they are sober?

"A If they are sober."

There is evidence that in addition to the plaintiffs who were not put in cells with white persons when they were in the Lockup some other "group" of whites and Negroes "were separated immediately" when placed in the Lockup. But there is no testimony, either with respect to the plaintiffs or this other group, as to whether each was put in a separate cell or whether, in some instances, two or more whites were put in the same cell and two or more Negroes in the same cell. Such vague testimony cannot overcome the direct testimony of the Chief of Police that no policy of segregation exists except that, naturally, drunks are segregated. There is nothing here to enjoin.

### 3. The City Swimming Pools

■ Lynchburg formerly had segregated swimming pools, one for the whites and one for the Negroes. One or more of the plaintiffs and other Negroes, seeking to end segregation in the pools, consulted some of the city officials with respect to it. Their request for desegregation was denied and they were told that if they actually sought to enter the pool that had been used only by white people both the pools would be

closed immediately. Obviously the city officials realized that they could not legally maintain segregation in the pools and chose the course of abandoning the use of these facilities rather than to desegregate them—a course that, where swimming pools are concerned, has been followed by many, if not all, of the southern cities in which the question has arisen. And, as in many other southern cities, the Negroes in Lynchburg, or some of them, chose to close the pools to both races rather than to permit the continuance of their segregated use. On July 4 1961 one or more of the plaintiffs and other Negroes tried to enter the white pool, were denied admission and both city-owned pools were then promptly closed. They have not reopened and the City Manager testified, "They are not going to be reopened."

The plaintiffs ask an injunction against the segregated operation of the pools. That their segregated operation would constitute a violation of plaintiffs' constitutional rights was tacitly conceded by the City by closing the pools when the issue was squarely raised by the attempt of the Negroes to enter the "white" pool. And counsel for the City has made no effort in this case to justify the legality of such segregated use. And of course he could not under the authorities. However he does contend that the matter has become moot by the action of the City in closing the pools and the evidence of the City Manager that "They are not going to be reopened." He cites as authority for this position Tonkins v. City of Greensboro (D.C.1958), 162 F. Supp. 549, and Clark v. Flory (D.C. 1956), 141 F.Supp. 248, affirmed (4th Cir.1956), 237 F.2d 597.

The Greensboro case is quite similar to the case at bar with the significant exception that the City in that case had stated that the pool would be sold to the highest bidder and had asked for bids. As the court was satisfied that the City was acting in good faith and would shortly divest itself of ownership of the pool, it declined to issue the injunction.

And Clark v. Flory, supra, is distinguishable as the beach in question had been closed by an act of the South Carolina legislature so the City had no power to reopen it.

On the other hand the case at bar seems to me to fall squarely within the doctrine of Bohler v. Lane, D.C., 204 F. Supp. 168, 169, cited by the plaintiffs in their brief. In that case Negroes had been denied the use of certain playgrounds, public parks and other recreational facilities in the City of Tampa but later, after suit was instituted, Negroes were allowed to use the facilities though there was no public announcement of the change in policy. At the hearing the defendants (city officials) stated that they now recognized that they could not maintain segregation in these recreational facilities and argued that the case against them was moot—there was no issue between the parties. However the court said:

"A voluntary cessation of an illegal conduct does not render a case moot. The Court is still required to consider the case and controversy presented, and to consider the grant of a prayer for declaratory relief. However, the cessation of the illegal conduct, if it is established, might render the granting of the injunction prayed for unnecessary, unjust and inequitable."

The Court went on to state that he was confident that the City's statements were made in good faith and that the City would not return to a policy of segregation. Consequently he denied the requested injunction but granted declaratory relief.

In a different context the Supreme Court approved such a course in Walling v. Youngerman-Reynolds Hardwood Co., Inc., 325 U.S. 419, 421, 65 S.Ct. 1242, 1243, 89 L.Ed. 1705, when it said:

"While 'voluntary discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power,' Walling v. Helmerich & Payne, 323

U.S. 37, 43 [65 S.Ct. 11, 89 L.Ed. 29], it may justify a court's refusal to enjoin future activity of this nature when it is combined with a bona fide intention to comply with the law and not to resume the wrongful acts. * * * "

I am satisfied that the Lynchburg officials will not again attempt to operate segregated swimming pools and so, following the Bohler case and the above statement of the Supreme Court, I will grant declaratory relief but deny the request for an injunction with respect to the swimming pools.

#### 4. The Nursing Home

The management of the Lynchburg Nursing Home falls within the jurisdiction of the City's Department of Public Health and Welfare of which Dr. John T. Hundley is the Director. He is a party defendant in this suit. It is designed to take care of indigent aged chronically ill or minor hospitalized and convalescent patients. It has a capacity of about ninety patients and the average age is approximately seventy-two and a half years. As Dr. Hundley testified:

"The mental condition itself has deteriorated. It is aged, it is upset and disturbed because of the cardiovascular, the heart, and circulatory condition, almost uniformly and without exception."

The Negro patients are all on one floor and the whites on another. There is no difference in the type or quality of the services rendered each. When asked whether there was any medical basis for segregation of the races Dr. Hundley replied:

"I would say none except the long, continued habits of individuals which in their deteriorated aged, confused state is a very difficult thing for them to reach or conclude or adjust themselves to any change in customary traditional habits. That is a good medical reason for me, from my standpoint."

Being indigent the patients obviously come principally from what may be termed the lower strata of society. They are not highly educated or very broadminded. On the contrary, in the main, the white patients are apt to have a considerably greater racial bias than the average southern white—and certainly very much more than the average upper class white. These facts are undoubtedly the cause of Dr. Hundley's fear of trying to change the customary traditional habits of his elderly sick white patients. And the elderly Negro patients, averaging over 70 years of age, have known nothing but segregation all of their lives, are thoroughly accustomed to it and, while they might not object to integration of the Home, almost certainly do not share the plaintiffs' crusading zeal on the subject and probably never give it a thought.

As Dr. Hundley further testified:

"Now you have put your questions entirely in the direction of the physician, the medicinal, the therapeutic, as it applies to medication, and I don't expect any difference in the response to medication based on race whatsoever but the emotional, the inherited, traditional attitude over a life time, is just as important to the standpoint of their happiness, their welfare, and when you are dealing with people like I am, their safety because every now and then a crutch lands over somebody's head so I will insist that the health, welfare and safety is dependent under present situations on the fact that we are not disturbing traditional patterns that individuals have learned to live with an average of 72.4% years."

This certainly seems to me to be a good and sufficient medical reason for segregation of these aged and indigent patients. Fifty years from now when a new generation of aged patients may have grown up in an era of general desegregation in the south the answer might be different—as it would be in the

north today. But we are dealing with the present and with the lifelong habits and prejudices of elderly, ailing and, in the main, not well-educated people. Nothing is to be gained by insistence upon a mixing of the races under these conditions. No injunction with respect to the operation of the Nursing Home will be issued.

### 5. *Organized Athletic Activities in the City Parks*

At the conclusion of the evidence counsel for the plaintiffs stipulated that the City Parks were not segregated except for the swimming pools and what he called "organized athletic activities", by which, it developed upon subsequent colloquy, he referred to organized baseball, football, softball and basketball leagues or other operations of that type.

The evidence shows that there are a number of such leagues which operate in the City Parks. The Babe Ruth League was the one most talked about in the evidence and, presumably, it is more or less typical of the others. It is a corporation, organized and run by certain local citizens for the purpose of running a baseball program for boys twelve to fourteen years old. Various teams are made up which play out a regular league schedule. The City has no control of the corporation. The corporation asks the city for a schedule of dates and times at which it can have the use of some of the baseball diamonds in the City Parks for the league games. The City has nothing to do with what persons are selected to play on the teams. The corporation has, however, so far selected only white boys for its teams. This might be because no colored boy has ever applied. There is no evidence on this point but the annual notice that is published by the league simply tells where boys may apply to try out for the teams. If no colored boy has ever applied it may be because there is also a similar league for colored boys which operates on pretty much the same basis.

It is obvious from the foregoing statement that there is no basis for an injunction against the City requiring the desegregation of the Babe Ruth League over which the City has no control. The cases cited by counsel for the plaintiffs are all cases in which a city or state, realizing that it could no longer maintain segregation in its parks, swimming pools or other recreational facilities has undertaken to lease them out on a long term basis with the thought that the lessees could continue segregation. Of course no such subterfuge has succeeded. But we have no such situation here. The mere granting of permission to a certain team to play at a park on a certain day or days is quite different from a long term exclusive lease of the park. It is true that the City could deny the League the use of the baseball fields unless it integrated its teams. But there is nothing in the United States Constitution to require the City to do so. The leagues are voluntary associations and the members are free to choose their own associates. As I said in Jackson v. School Board of the City of Lynchburg, D.C., 201 F.Supp. 620, 624:

> "[I]t has not yet been held to be unconstitutional for individuals to prefer to associate with others of their own race, class, background or, if you like, prejudices."

And there is no reason for the City to interfere with such freedom of choice— or freedom of association as it is sometimes called.

### 6. *Employment*

As stated above, discrimination with respect to employment is not mentioned in the complaint. It was raised in the "Specificity of Segregation", which I have been treating as an informal amendment to the complaint, with respect to (a) jobs in the Fire Department, (b) jobs, promotion and duty assignments in the Police Department, (c) the selection of election officials and (d) jobs, promotions and assignments in all departments of the City. However at the

conclusion of the evidence counsel for the plaintiffs stipulated that there was no longer any contention with respect to employment in the Police Department but only with respect to the assignments and promotions in that Department and that there was no contention as to employment in the Fire Department or the employment of secretaries by the City. And there is no evidence in the case with respect to the election officials. And, though not mentioned in either the bill of complaint or the "Specificity", there was some evidence and a statement of counsel's dissatisfaction with respect to employment in the Nursing Home and the Social Service workers.

This would leave remaining with respect to employment (a) promotion and duty assignments in the Police Department and (b) jobs, promotions and assignments in all departments of the City other than secretarial jobs. There was evidence in respect to (a) but with respect to (b) there was evidence only with respect to assignments of the Negro social worker and the Negro nurse and with respect to jobs in the City generally an Exhibit showing that of 531 employees 97 were Negroes. This is eighteen plus per cent and, while the percentage of Negroes in the total population of Lynchburg is slightly larger than this, the difference is too insignificant to warrant a finding that Negroes have been discriminated against in employment. We can confine this discussion therefore to (a) promotions and duty assignments in the Police Department and (b) the assignments of the Negro social worker and the Negro nurse.

We are concerned here, therefore, only with the promotions and duty assignments of the two Negroes on the Police force and the one Negro social worker and the one Negro nurse—a total of four people.

█ I have heretofore refrained from commenting on a defense strongly urged by counsel for the defendants to the effect that the plaintiffs have no standing to bring this suit as a class suit with respect to most of the issues raised because there is no allegation or evidence that the plaintiffs have themselves been hurt by certain of the practices complained of and also, with respect to some of the issues, that the class the plaintiffs purport to represent is not so large that the members could not be joined as plaintiffs. But when we get down to dealing with the rights of four people, none of whom have joined as plaintiffs and all of whom appear from the evidence to be entirely satisfied with their treatment, the limit has been reached. Certainly the class is not so numerous that the individual members could not have been joined. And certainly the plaintiffs are neither city policemen, social workers or nurses. It seems crystal clear therefore that they cannot bring a class suit on behalf of these four city employees whose only common demoninator with the plaintiffs is that of race and who, from all we can judge from their testimony in the case, are completely satisfied with their treatment by the city.

The precise scope of this doctrine perhaps stands in need of some clarification and I have therefore heretofore in this opinion refrained from relying upon it. But it does seem clear that the plaintiffs should not be allowed to complain of the work assignments and prospects for promotion of two "classes", consisting of two persons each, with whom the plaintiffs have nothing in common except that they belong to the same race.

The latest word on the subject from the Supreme Court is in Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed. 2d 512, a suit brought by certain Negroes in Mississippi to enjoin prosecutions under Mississippi's "breach-of-peace statutes". The court said at pp. 32 and 33, 82 S.Ct. at p. 550:

> "Appellants lack standing to enjoin criminal prosecutions under Mississippi's breach-of-peace stat-

utes, since they do not allege that they have been prosecuted or threatened with prosecution under them. They cannot represent a class of whom they are not a part. McCabe v. Atchison, T. & S. F. R. Co., 235 U.S. 151, 162–163 [35 S.Ct. 69, 59 L. Ed. 169]."

If Negroes who have not been threatened with prosecution under particular criminal statutes cannot represent those of their race who have been so threatened, though they doubtless might form a very large class, surely they cannot represent members of a class consisting of only two persons whose wrongs, if any, are not in any way shared by these plaintiffs.

█ But, aside from this legal bar, the only objections to the job assignments of these two policemen is that the Negroes are assigned to work in areas that are predominantly Negro areas because, as the Chief of Police testified, it was felt that they could do a more effective job there than white policemen could. From this plaintiffs argue that the chances of promotion of these colored policemen are not as good as those of the white policemen. But this contention finds no support in the evidence of the Chief of Police or any other evidence. It is merely an assumption on the part of plaintiffs' attorneys.

The same thing precisely can be said of the two social workers. They are assigned to work in Negro homes because their superiors feel that they can do a better job there than white workers could—and certainly a better job than if they were working in white people's homes. Here again no discrimination is evident.

### Conclusion.

An order will be entered rendering a declaratory judgment that the City cannot operate swimming pools on a segregated basis but otherwise the prayers of the plaintiffs will be denied.