**Virgil WOOD et al., Plaintiffs,**

v.

**Raymond E. HOGAN and Lynchburg General Hospital, Inc., Defendants.**

**Civ. A. No. 535-A.**

United States District Court
W. D. Virginia,
Lynchburg Division.

March 8, 1963.

---

Len W. Holt, Norfolk, Va., Simon L. Cain, Washington, D. C., and Jonathan Goldberg, New York City, for plaintiffs.

Arthur B. Davies, III, Lynchburg, Va., for defendants

MICHIE, District Judge.

Raymond E. Hogan, Administrator of the Lynchburg General Hospital, and the Hospital Authority of the City of Lynchburg were originally made parties to a suit brought by the plaintiffs, as a class action, against them and various officials of the City of Lynchburg, Virginia, in what has been aptly termed by plaintiffs' counsel as an "omnibus" suit—designed to end racial segregation in the city in all of its phases. Not being able to perceive how the actions alleged with

respect to these two defendants could have arisen "out of the same transaction, occurrence, or series of transactions or occurrences" (Fed.R.Civ.P. Rule 20) as those involving the other defendants, I concluded that the "omnibus" had become overcrowded and granted a motion for severance made by counsel for these defendants, thus necessitating the transfer of the charges against them to this simpler vehicle. See Wood v. Vaughan, D.C., 209 F.Supp. 106.

The Hospital Authority of the City of Lynchburg might well have been held to be an agency of the State of Virginia within the reach of various segregation decisions since its directors were appointed by the Lynchburg City Council. However, shortly after this suit was instituted, the Authority was dissolved by proceedings in the Corporation Court of the City of Lynchburg and its assets transferred to Lynchburg General Hospital, Inc., a newly organized Virginia non-stock, non-profit, charitable corporation with a self-perpetuating board of trustees, who initially were the same persons as constituted the last board of directors of the Authority. The new corporation, of course, also assumed all of the obligations of the old. Although it may not have been directly admitted, there is no doubt but that the transfer was motivated by a feeling that a defense to this action was more apt to be successful if the hospital were operated by a charitable corporation which had no connection with the state or city as the former Authority did through City Council appointment of its directors.

Upon the transfer of the hospital to the new corporation, Hogan and the old Hospital Authority moved that the suit be dismissed as to them. As Hogan was concededly employed by the new Hospital in the same capacity in which he had been employed by the former Hospital Authority, I denied the motion as to him but granted the other motion, at the same time giving the plaintiffs leave to make the new Lynchburg General Hospital, Inc. (hereinafter usually referred to as "the Hospital") a party to this suit. And this was done.

The plaintiffs then filed amended pleadings from which it appears that they seek to apply the constitutional provision which outlaws segregation by a state or state agency to the new hospital primarily on these grounds:

1. That there was merely a "pro forma change of indicia of ownership";

2. That the directors of the new hospital corporation are the same persons who were directors of the old Hospital Authority;

3. That the original cost of the hospital was defrayed in part by contributions of the United States under the Hill-Burton Act, 42 U.S.C. § 291 et seq. and by contributions of the City of Lynchburg;

4. That the change was made only to avoid a desegregation order;

5. That the Hospital is licensed by the state and that anyone who holds any kind of state license is thereby made subject to the constitutional prohibition of segregation in operating under that license; and

6. That the defendant hospital's tax exempt status as a charitable corporation operates to the same effect as its license is claimed to operate.

Further, by the amended complaint, the plaintiffs, two of whom are residents of the City of Lynchburg, undertook to represent not only those Negro patients who were affected by segregation in the Hospital, but also, more specifically, the Negro doctors in Lynchburg (there are only three), the Negro dentists in Lynchburg (again there are only three), Negroes who desire to attend the school of nursing operated by the Hospital and Negroes who are denied jobs in the Hospital or who, if employed, are given assignments based on their race.

None of the plaintiffs are doctors or dentists. It is not alleged that any of them desire to attend the school of nursing or were employees of the Hospital. It is alleged that "Negroes, including plaintiffs, are assigned and denied jobs

throughout hospital solely because of race" but this allegation must have been inadvertent as applied to the plaintiffs as, at the hearing, there was not the slightest suggestion that any of the plaintiffs had ever been employed by the Hospital or been denied employment by it.

It was not alleged that the plaintiffs were patients in the Hospital at the time the complaint was filed but it was alleged that they had "been forced to occupy racially segregated beds, rooms and wards by the defendant hospital." And at the hearing it was proved that at least one of the plaintiffs had been a patient and another testified that he expected to have to go there sometime for treatment of an existing condition.

█ Plaintiffs not having alleged their own membership in certain classes which they undertook to represent, motions to dismiss were granted before trial as to the allegations of discrimination against nurses, employees and student nurses and also against citizens generally and the taking of evidence was limited to segregation of patients and to any discrimination against Negro doctors and dentists which such patients may have desired to have treat them while they were patients in the hospital. It may be doubted that the plaintiffs are qualified at this time to represent the Negro patients in the Hospital but, as one is an ex-patient and another a prospective patient and it would be difficult for a current patient to institute and prosecute such a suit, I feel that these plaintiffs should be permitted to do so as a class action and so hold.

The testimony at the hearing conclusively proved that there was no discrimination against Negro doctors or dentists. All six of them in fact do practice freely in the Hospital. The only complaint came from Dr. Walter Johnson who had practiced freely in the Hospital except that he had not been allowed to practice obstetrics there. It was, however, proved that obstetrics is a specialty, that a doctor (white or colored) is not allowed to practice a specialty unless he

has done certain special work in that field and that Dr. Johnson simply had not qualified as a specialist in obstetrics. He had been told by the Hospital authorities what he would have to do to qualify but had not done so, though his testimony gave the impression that he was still considering doing so. He did testify that he thought he would have been found qualified if he were white. But he had nothing to back up that suspicion or to contradict the convincing testimony to the contrary given by Dr. Lippard, a specialist in obstetrics and gynecology and the Chief of Staff of the Hospital, corroborated as to certain aspects by the defendant Hogan. There is therefore no merit in the allegation that Negro doctors or dentists have been discriminated against by the Hospital.

We come then to the heart of the case —segregation of patients by race in wards and rooms. Such segregation was fully proved and, in fact, was never denied.

There are two justifications for it—or perhaps one might more properly be called a reason why I can do nothing about it even if it is not justified.

█ First there is the contention that such segregation is for the good of the patients—of both races. I took that view in Wood v. Vaughan, supra, in upholding segregation of patients by floors in the Lynchburg home for ailing, elderly, indigents. The inmates of that home have an average age of over 72, come generally from the lower, less well-educated strata of society and generally speaking may be expected to have a greater amount of racial prejudice than the average patient in the Lynchburg General Hospital. Nevertheless their ailments are probably not so severe as those in the Hospital and the latter might therefore be expected to be more seriously affected by anything that upset their mental equilibrium.

It was most interesting to find that Dr. Johnson, the Negro doctor who complained that he was not allowed to practice obstetrics in the Lynchburg Hospital and who is, of course, generally speak-

ing opposed to segregation, strongly believes that segregation in the Hospital is for the good of the health of the patients of both races. And so I feel that segregation here can be justified on the same grounds as in the case of the Lynchburg Nursing Home.

■ In any event, whether segregation in the Lynchburg Hospital be or be not justified by reason of its beneficial effect on the patients' health, I do not believe that the court has any power to terminate it. If the Hospital were an agency of the state or city or in any way controlled by either of them, the power would undoubtedly exist. I can see no distinction why such segregation is any less subject to the reach of the Fourteenth Amendment, as construed, then segregation in the public schools, parks, playgrounds, golf courses, swimming pools, etc., as to all of which such segregation has been held to be unconstitutional. And if the old Hospital Authority, which was in the last analysis controlled by the City through appointment of the members of its board of directors, had continued to operate the Hospital I would have felt that segregation in it should be enjoined unless justified, as above indicated, by its beneficial effect upon the patients' health. But the new hospital corporation, though having the same initial board of directors as the former hospital authority, does not seem to be in any way subject to state or city control. The directors, while they undoubtedly owe their initial appointment to the City Council are in no way any longer bound to it. As a board they can thumb their collective noses at the City and go their way without fear of retaliation and neither the City Council nor any other agency of the state can remove them from office. The state has no control over the operation of the Hospital in any way, save as it may make general regulations applicable to all hospitals.

As indicated above the plaintiffs argue that the transfer of ownership from the old Authority to the new charitable corporation was merely a "pro forma change of indicia of ownership". Pro forma is a rather vague expression and it is better to forget that characterization of the change and look to see what the change was. And the change was one which removed any vestige of control on the part of City Council or any other state agency.

Further it is alleged that the change was made only to avoid a desegregation order. As indicated above I believe this is true. But the purpose for which a thing is done does not alter the fact that it was done. And in this case what was done was to change the ownership of the Hospital from a body which probably would have been held to be an agency of a state to a body which clearly is not an agency of the state.

Plaintiffs in a sort of frontispiece to their brief state:

"IF PLAINTIFFS HAD TO RELY ON ONE CASE, AND ONE CASE, ONLY, THAT CASE WOULD BE:

"Hampton et al. vs. The City of Jacksonville, et al., 304 F.2d 320 (5th Cir., 17 May 1962)

" ' * * * So, too, where the City of Jacksonville, which has long been in the business of operating golf courses for its residents, elects to sell the golf courses, but only on the condition, that they continue to be used in such manner that the public will enjoy the benefits in the same capacity, the city is permitting the private individual to perform this part of the City's function.'

*     *     *     *     *     *

" 'We conclude that the inclusion of the reversionary clauses in these conveyances *constituted the purchaser of the two golf courses state agents, within the purveiw of the Fourteenth Amendment.*' (emphasis supplied) 304 F.2d at 323."

Perhaps, as plaintiffs appear to think, this is the strongest point they have. But it is not strong enough. The very quotation used by plaintiffs shows that this Jacksonville golf course case did not involve an out-and-out transfer with no strings attached but that it provided that the land involved would revert to the city

if it ever ceased to be usable by the public as a golf course. Here, after the transfer, there were no strings held by and no possibility of a reverter to either the City or the old Hospital Authority. And it has never been held that a city could not go out of the business of running hospitals, golf courses or other enterprises by an outright sale with no strings attached.

As said by the court in the Jacksonville case at p. 323:

"Appellees' reliance on Tonkins v. City of Greensboro, supra [4 Cir., 276 F.2d 890], is misplaced. In that case there was an outright sale of a swimming pool *without any restriction or reversionary clause of any kind.* The inclusion of the restrictive covenant here is a distinguishing factor of the utmost legal significance. * * *"

■ It is argued that the present owner of the Hospital should be subject to the reach of the Fourteenth Amendment because the original cost of the Hospital was defrayed in part by contributions of the United States under the Hill-Burton Act, 42 U.S.C. § 291 et seq., and in part also by contributions of the City of Lynchburg. But there were no strings attached to those contributions, at least with respect to control of the Hospital, and the Hill-Burton Act in fact expressly authorizes segregation by race in hospitals constructed in whole or in part by Hill-Burton funds. 42 U.S.C. § 291e(f) provides in part that before an application for Hill-Burton funds may be approved assurances may be required from the applicant "that (1) such hospital or addition to a hospital will be made available to all persons residing in the territorial area of the applicant, without discrimination on account of race, creed, or color, but an exception shall be made in cases where separate hospital facilities are provided for separate population groups, if the plan makes equitable provision on the basis of need for facilities and services of like quality for each such group * * *."

Plaintiffs argue that that permissive segregation provided for by the above quoted provision of the Hill-Burton Act is unconstitutional. And it may well be. Though plaintiffs ask me to hold it unconstitutional I do not feel called upon to do so. Congress could perhaps at this late date forbid segregation in hospitals erected with Hill-Burton funds. But I doubt that proposition very much if the hospital is a private hospital not state controlled. At any rate it certainly has not done so but on the contrary has attempted to give its blessing to segregation in such hospitals. The question here is not what Congress ought to do but what it has done and, particularly, whether it has done anything to make the recipient of Hill-Burton funds subject to federal, state or local governmental control and therefore subject to the provisions of the Fourteenth Amendment. And clearly it has done no such thing.

■ Plaintiffs further argue that the fact that the Hospital is licensed to operate by the state or city makes it subject to state regulation and therefore imposes a duty upon the state to prevent segregation in the Hospital. Mr. Justice Douglas has come very close to taking that position in his concurring opinion in Garner v. Louisiana, 368 U.S. 157 at p. 182, 82 S.Ct. 248, at p. 261, 7 L.Ed.2d 207 when he said:

" * * * Those who run a retail establishment under permit from a municipality operate, in my view, a public facility in which there can be no more discrimination based on race than is constitutionally permissible in the more customary types of public facility.

" * * * And there can be no difference, in my view, between one kind of business that is regulated in the public interest and another kind so far as the problem of racial segregation is concerned. I do not believe that a State that licenses a business can license it to serve only whites or only blacks or only yellows or only browns. Race is an impermissible classification when it comes to parks

or other municipal facilities by reason of the Equal Protection Clause of the Fourteenth Amendment. By the same token, I do not see how a State can constitutionally *exercise its licensing power over business either in terms or in effect to segregate the races in the licensed premises.* * * " (Emphasis supplied.)

"One can close the doors of his home to anyone he desires. But one who operates an enterprise under a license from the government enjoys a privilege that derives from the people. Whether retail stores, not licensed by the municipality, stand on a different footing is not presented here. But the necessity of a license shows that the public has rights in respect to those premises. The business is not a matter of mere private concern. Those who license enterprises for public use should not have under our Constitution the power to license it for the use of only one race. * * * "

Mr. Justice Douglas does not seem to distinguish clearly here between a license which is used as a means of regulating a business and a mere license for tax purposes such as is practically universal for all businesses, trades and professions in Virginia. And while in some of the foregoing he is clearly saying that the license cannot be used by the state as a weapon to compel segregation, some of his language does lend itself to the construction that the mere grant of a license which leaves the licensee free to segregate or not, as he chooses, brings him within the reach of the Fourteenth Amendment so that segregation becomes thereby forbidden. Read as a whole I do not think that Mr. Justice Douglas intended the latter construction to be put upon what he said.

As said by the Fourth Circuit Court of Appeals in Williams v. Howard Johnson's Restaurant, 268 F.2d 845 at p. 847 (1959):

"This argument fails to observe the important distinction between activities that are required by the state and those which are carried out by voluntary choice and without compulsion by the people of the state in accordance with their own desires and social practices. Unless these actions are performed in obedience to some positive provision of state law they do not furnish a basis for the pending complaint. * * * The statute (restaurant licensing law) is obviously designed to protect the health of the community but it does not authorize state officials to control the management of the business or to dictate what persons shall be served. The customs of the people of a state do not constitute state action within the prohibition of the Fourteenth Amendment. * * * "

As to the argument based on tax exempt status, that status follows not from any control that the state exercises over it but from the fact that it is a charitable corporation. And consequently it gives the state no more authority over the hospital than it has over other private charitable corporations.

The question of whether or not the contribution of public funds converts what would otherwise be a private charitable corporation into a public corporation has recently been passed upon by the Supreme Court of Appeals of Virginia in the case of Khoury v. Memorial Hospital, 203 Va. 236, 123 S.E.2d 533. In this case a physician was dismissed from the staff of the hospital and his privilege to practice therein was withdrawn. The doctor filed a suit for an injunction to enjoin his dismissal and the withdrawal of his right to practice in the hospital.

One of the questions in the case was stated by the court at p. 238, 123 S.E.2d at p. 534, to be:

"Is the hospital a public hospital and, if so, have any rights of Dr. Khoury and his patients been contravened as a result of the hospital's denial of staff privileges to Dr. Khoury?"

The court described the defendant hospital as follows:

"The hospital is a non-stock, non-profit corporation chartered on July 6, 1950, pursuant to the provisions of Chapter 13, Title 13, Code of Virginia, 1950, as amended, 'to establish, construct and maintain a regional hospital for the counties of Mecklenburg, Brunswick and Lunenburg, Virginia, to be located at South Hill * * * for the treatment, healing and care of ill, wounded, disabled and diseased persons. * * *'

"The hospital was originally constructed at a total cost of approximately $825,000.00, $415,000.00 thereof contributed by the federal government in the form of funds authorized by the Hill-Burton Act (42 U.S.C.A. § 291, et seq.), $39,-000.00 by the Commonwealth of Virginia and $372,000.00 by local subscriptions. An addition was constructed later at a total cost of approximately $322,000.00, consisting of $165,000.00 in Hill-Burton funds and $156,000.00 in local subscriptions.

"By virtue of the charter, and the by-laws adopted pursuant thereto, management of the hospital is vested in a self-perpetuating board of trustees. The by-laws provide for the appointment of an administrator to serve as a representative of the board in the management of the hospital."

The similarity to the history and present situation of the Lynchburg General Hospital is apparent.

In finding for the defendant hospital, the court stated at pp. 244–245, 123 S.E. 2d at p. 538:

"We next turn to the question of whether the use of federal and state funds for construction thereby constituted the hospital a public corporation.

"The distinctions between a public and a private corporation have been so carefully drawn and so long recognized that we experience no difficulty in answering the question in the negative.

\* \* \* \* \* \* \*

"The evidence does not disclose that any conditions were attached to the funds contributed by the Commonwealth to the hospital. The only conditions connected with the federal funds were that the hospital was required, before obtaining such funds, to give assurances that it would treat certain indigent patients free of charge and that no person would be denied admission because of race, creed or color. These conditions are completely insufficient to convert the hospital into a public hospital. In fact, the Hill-Burton Act itself provides:

"'Except as otherwise specifically provided nothing in this subchapter shall be construed as conferring on any Federal officer or employee the right to exercise any supervision or control over the administration, personnel, maintenance, or operation of any hospital * * * with respect to which any funds have been or may be expended under this subchapter.' (42 U.S.C.A. § 291m).

"The hospital was established pursuant to a charter, granted by the Commonwealth, conferring upon its public spirited organizers the right and authority to operate as a private corporation. That charter is a contract between the state and the incorporators. One of the unwritten provisions of that contract, is that the trustees of the corporation shall have the right to conduct its affairs as they might, in their sound discretion, see fit. Inherent in the charter is the understanding that, except as provided by law, the state will not interfere in the corporation's internal affairs. Roanoke Cemetery Co. v. Goodwin, 101 Va. 605, 611, 44 S.E. 769; Collins v. Doyle, 119 Va. 63, 69, 89 S.E. 88.

"We are of the opinion that when the trustees of a private hospital, in their sound discretion, exclude a doctor from the use of the facilities of the hospital, the courts are without authority to nullify that discretion by injunctive process. There are no constitutional or statutory rights of the doctor, or of his patients who wish to be treated in the hospital by him, which warrant such interference. Levin v. Sinai Hospital of Baltimore City, 186 Md. 174, 46 A. 2d 298, 301, 303; Edson v. Griffin Hospital, 21 Conn.Sup. 55, 144 A.2d 341, 345; Akopiantz v. Board of County Com'rs of Otero County, 65 N.M. 125, 333 F.2d 611, 613; Natale v. Sisters of Mercy of Council Bluffs, 243 Iowa 582, 52 N.W.2d 701, 709; 26 Am.Jur., Hospitals and Asylums, § 9, p. 592; 24 A.L.R.2d 851."

A case almost identical to the case at bar is Simkins v. Moses H. Cone Memorial Hospital, D.C., 211 F.Supp. 628, decided by the United States District Court for the Middle District of North Carolina on December 5 1962. In that case likewise, certain Negroes sought to restrain two hospitals and their respective administrators "from continuing to deny the admission of physicians and dentists to hospital staff privileges, and admission of patients to hospital facilities, on the basis of race".

The sole issue in the case was conceded by both parties to be whether under the facts the defendant hospitals were instrumentalities of the state. As here, both hospitals there were non-profit, tax exempt and state-licensed. Both had received funds under the Hill-Burton Act. In the case of the Cone hospital a minority of the board was appointed by the City Council of Greensboro and the majority was self-perpetuating. In the case of the other hospital the entire board was a self-perpetuating board. Both hospitals admitted that they were pursuing racially discriminatory practices, both by barring Negro physicians and dentists and treating Negro patients differently from white patients.

The court, in discussing the argument with respect to the use of Hill-Burton funds to build the hospitals, said at p. 639:

"Since no state or federal agency has the right to exercise any supervision or control over the operation of either hospital by virture of their use of Hill-Burton funds, other than factors relating to the sound construction and equipment of the facilities, and inspections to insure the maintenance of proper health standards, and since control, rather than contribution, is the decisive factor in determining the public character of a corporation, it necessarily follows that the receipt of unrestricted Hill-Burton funds by the defendant hospitals in no way transforms the hospitals into public agencies."

To the same effect is Eaton v. Board of Managers, 261 F.2d 521 (4th Cir., 1958), a case involving the exclusion of colored physicians from courtesy staff privileges at a Wilmington, North Carolina, hospital which had been built on land owned by the city with funds left to the city for the purpose by a charitable bequest. Later the land and building were transferred to a private charitable corporation run by a self-perpetuating board of managers originally designated by statute. The deed contained a provision of reversion in case of the disuse or abandonment of the hospital. It was contended that the corporation was an instrumentality of the city and therefore subject to the provisions of the Fourteenth Amendment. But the court said at p. 525:

"The plaintiffs rightfully confine their effort on this appeal to showing that the hospital is an instrumentality of the State. They do not argue that the exclusion of qualified physicians solely because of their race from an institution devoted to the care of the sick is indefensible, as they might well do if this court was the proper forum to determine the ethical quality of the action. As a Federal court we are powerless to

take into account this aspect of the case. We may not interfere unless there is State action which offends the Federal Constitution. From this viewpoint we find no error in the decision of the District Court for the facts clearly show that when the present suit was brought, and for years before, the hospital was not an instrumentality of the State but a corporation managed and operated by an independent board free from State control.

"This has not always been the case. In 1881, when the hospital was established, and thereafter during the period ending in 1901, when it was supported and operated by municipal authority, it might well have been described as a State agency even though the funds for its operation had been illegally appropriated by the municipalities. But in that year a basic change took place when, taking advantage of the benificence of Mr. Walker, the City and County conveyed the land on which the old building stood to the Board of Trustees of the James Walker Memorial Hospital, a new corporation created by an act of legislature with full powers of management and self-perpetuation. At that time a new building was erected on the site with funds provided by the benefactor. It would seem from the evidence that the hospital then ceased to be a public agency, although in the subsequent years until 1951 it received certain financial support from the City and County, the amount of which the record before us does not reveal. Any doubt on this point vanished in 1952 and 1953, when annual appropriations came to an end as the result of the decision of the Supreme Court of the State, and patients sent to the hospital by the local govern-ments were treated and paid for under contract on a per diem basis. It is beyond dispute that from that time on the civic authorities have had no share in the operation of the hospital and the Board of Managers have been in full control."

In Hampton v. City of Jacksonville, supra, the result of this case, in view of the present status of the law, was questioned at p. 323 of 304 F.2d as follows:

"* * * With reference to the Fourth Circuit case of Eaton v. Board of Managers of James Walker Memorial Hospital, supra, it appears that it was decided before the Supreme Court announced its decision in the [Burton v.] Wilmington Parking case, supra [365 U.S. 715, 81 S. Ct. 856, 6 L.Ed.2d 45]. Being unable, as we are, to find any valid distinction between the effect of the lease in the Wilmington Parking Authority case and the sale with a reversionary interest in the Walker Hospital case, we doubt whether the Court of Appeals for the Fourth Circuit would have decided the Hospital case as it did had it followed the Supreme Court decision. * * *"

Be this as it may this ground of criticizing the Eaton case is not available here since the deed of transfer from the old Hospital Authority to the defendant here contained no such reversionary clause.

I conclude therefore that the Lynchburg General Hospital is a private charitable corporation in no sense under the control or an agency of the state of Virginia and that consequently the provisions of the Fourteenth Amendment prohibiting certain actions by the states and their agencies are not applicable to it. It follows that the injunction must be denied.

An order will be entered accordingly.