## RALPH H. EDSON *v.* THE GRIFFIN HOSPITAL ET AL.

SUPERIOR COURT      NEW HAVEN COUNTY      FILE No. 85348

Memorandum filed March 27, 1958

*Leon McCarthy,* of Ansonia, and *John J. Sullivan,* of New Haven, for the plaintiff.

*Wiggin & Dana,* of New Haven, for the defendants.

DEVLIN, J. The plaintiff, a resident of the town of Shelton, is a duly licensed physician and surgeon who has been practicing in the Naugatuck valley towns since 1938. In 1943 he became a member of the staff of the defendant hospital and treated patients as a physician and performed certain surgery with the assistance of other surgeons in the hospital until 1954. At that time, as the result of the adoption of new by-laws, rules and regulations, he was denied the right to use the facilities of the hospital in performing certain major surgical operations. These are described as cholecystectomies, abdominal hysterectomies, pelvic repairs, Caesarean sections and surgical procedures on female tubes and ovaries.

In this action he seeks to restrain the defendant hospital from prohibiting him the use of its facilities in performing these operations, claiming the rules and regulations adopted are arbitrary and the action of the board in curtailing his activities without a hearing illegal and in violation of his constitutional rights.

The basis of his first claim is that the defendant is a public corporation and public hospital maintained for the medical and surgical treatment of all persons who apply and that he has a right to practice therein so long as he stays within the law and conforms to all reasonable rules and regulations. In effect he contends the hospital is a public institution receiving considerable governmental and public financial assistance, some immunity from taxation, and that he and his patients are entitled to the facilities of the hospital as a matter of right.

The basic question is whether the defendant is a private corporation operating a nonprofit private hospital or is a public corporation operating a public hospital. The defendant was originally incorporated as the Derby Hospital by virtue of a special act of the General Assembly approved June 14, 1901. 13 Spec. Laws 1103. It does not operate for profit.

Considerable evidence was produced showing that in any number of civil actions brought by and against hospitals of this type, they have admitted and been described as being "charitable corporations," "public institutions," "public hospitals" and "public charitable corporations"; that they receive certain tax exemptions not enjoyed by private corporations; that they are licensed, inspected and subject to some regulation by the commissioner of health and the hospital cost commission; and that they receive state, city and town financial aid.

The distinction between a public and private corporation has long been recognized. A public corporation is an instrumentality of the state, founded and owned in the public interest, supported by public funds, and governed by those deriving their authority from the state. Public institutions such as state, county and city hospitals and asylums are owned by the public and are devoted chiefly to public purposes.

On the other hand, a corporation organized by permission of the legislature, supported largely by voluntary contributions, and managed by officers and directors who are not representatives of the state or any political subdivision, is a private corporation, although engaged in charitable work or performing duties similar to those of public corporations. *Trustees of Dartmouth College* v. *Wood-*

*ward,* 17 U.S. (4 Wheat.) 518, 669; *Hughes* v. *Good Samaritan Hospital,* 289 Ky. 123, 126. The difference between a public and private hospital is now clearly established, the latter being one founded and maintained by private persons or a corporation, the state or municipality having no voice in the management or control of its property or the formation of rules for its government. 41 C.J.S. 332; 26 Am. Jur. 588, § 3; note, 24 A.L.R.2d 850, 851. The mere fact that it is the recipient of state aid, financial assistance from the General Assembly, special grants from the surrounding towns, or contributions from the United Fund, Community Chest or New Haven Foundation does not change its status from a private to a public hospital. Ninety-five per cent of its income is derived from charges for services rendered. *West Coast Hospital Assn.* v. *Hoare,* 64 So. 2d 293, 297 (Fla.).

It is true, as the plaintiff claims, that in any number of instances hospitals in this state have been referred to as "public hospitals" or "public institutions," but in each instance consideration must be given to the particular problems in issue. When tax questions or general liability matters are dealt with, the terms are properly used and the courts have so categorized them. It does not follow, however, that such a characterization renders them subject to public control. That they are engaged in charitable work for the benefit of the public, and thereby affected with a public interest, does not make them public corporations. It means no more than that they are operated for the public generally without gain or profit. The test is whether, under the charter or corporate powers granted, they have the right to elect their own officers and directors, with the power to manage their own affairs. *Levin* v. *Sinai Hospital,* 186 Md. 174, 178; *Washingtonian Home of Chicago* v. *Chicago,* 157 Ill. 414, 422, 425.

The original act incorporating the defendant empowered it to "make and execute such by-laws, rules, and regulations not contrary to the laws of this state as shall be deemed necessary for the proper management of the affairs of the corporation"; 13 Spec. Laws 1103, § 1; and provided for the selection of a board of trustees who "shall have power to manage and conduct all the business and affairs of the corporation, and to appoint all necessary and proper servants, officers, attendants, and agents, and to remove the same at pleasure, and to do any and all acts necessary and proper to be done for the full and effectual carrying out of the purposes of said corporation." Id., 1104, § 4. The defendant is found to be a private hospital with the right to exercise control over its own internal operations and management.

The next claim of the plaintiff is that the rules and regulations adopted to govern appointments to the medical staff are arbitrary. Under the new rules, appointments were to be made by the executive committee upon recommendation of the general staff and medical board to the joint conference committee. It is a fundamental and generally accepted rule that courts will not interfere with the internal management of a private corporation. Questions of policy and management are left solely to the honest decisions of the officers and directors, and the court is without authority to substitute its judgment for theirs. The same rule applies to private hospitals. 26 Am. Jur. 592, § 8. The rules adopted by the hospital effective in February of 1954 were similar to those of standard hospitals. Testimony from nationally recognized authorities classed them as reasonable and in accord with modern hospital practice. They were necessary to enable the hospital to acquire and maintain an accredited standing. *Green* v. *St. Petersburg,* 154 Fla. 339, 342. The provision for the division of its medical staff into several classes

was a reasonable one, and the rules governing appointment to the staff apply to all physicians alike and tend to maintain a high degree of skill and integrity in the membership. The fact that appointments to the associate staff were to be "limited to men of proven ability and experience" is not fatal as failing to set up a proper and just standard. It is not possible to prescribe by rule a standard of skill dependent upon experience. *Selden* v. *Sterling,* 316 Ill. App. 455, 462.

The plaintiff was classified with this group. His chief objection, however, was that he did not receive a higher classification in view of his previous training and experience and could not continue performing all types of operations as he had in the past. In effect, it is a claim of a vested right to operate in the rooms of the hospital. Since the defendant is a private hospital, the question remains whether or not it has a right to exclude a licensed physician from its surgical staff. The general rule seems to be that a private hospital has the right to exclude any physician from practicing therein, and such exclusion rests within the sound discretion of the managing authorities. *Levin* v. *Sinai Hospital,* 186 Md. 174, 179; 26 Am. Jur. 592, § 9. A physician has no vested or constitutional right to practice in a hospital, but merely a privilege which may be granted or denied even though his qualifications are of the highest. *West Coast Hospital Assn.* v. *Hoare,* 64 So. 2d 293, 296 (Fla.) ; *Hayman* v. *Galveston,* 273 U.S. 414, 416. Most of the authorities base the right of exclusion not upon the proper application of reasonable rules and regulations but upon the fundamental right of a private corporation to manage its own internal affairs. In effect, they say a private hospital may lawfully exclude a physician from its staff without assigning any reason for that exclusion.

The plaintiff claims that when the new rules were adopted there was a specific provision dealing with the withdrawal of privileges, and the action of the medical board in curtailing his was illegal and void because he was never granted a hearing or apprised of the cause for their withdrawal. Under the new rules it was provided: "In order to make the transition from the previous by-laws to the present by-laws as fair and equitable as possible it is the intent of the Executive Committee not to withdraw, except for cause, any privileges now held by the present staff." When the by-laws were changed, the plaintiff was the president of the medical board. At the meeting on January 4, 1954, the proposed changes and their effect upon the various physicians were discussed very thoroughly. He knew that when they went into effect he could not perform these operations. This one issue consumed approximately two hours, during which the plaintiff was given every opportunity to present his point of view. During the conference he specifically mentioned that he was to some degree not speaking as president of the medical staff but as voicing his own personal opinion about the program. After the deliberations, the medical board voted to approve the recommendations, with the plaintiff casting the one dissenting vote. After the changes had been approved by the board of trustees, another meeting of the medical board was held on January 19, 1954, and the minutes reported show that, after the rediscussion, the plaintiff had withdrawn his objections to the program.

On February 5, 1955, the plaintiff addressed a letter to the hospital applying "for a restoration of surgical privileges approximating those which I enjoyed for fifteen years prior to the introduction of our present regulations," it being his claim that he had agreed to abide by these rules until they could be given a fair trial. At a meeting held on Febru-

ary 7, 1955, the medical board acted unfavorably upon his request, and on the 14th he appeared before the executive committee of the board of trustees with a prepared statement of his case. The matter was then referred back to the medical board, and as a result another hearing was held on April 4, 1955. He appeared asking permission for additional surgical privileges, but the board reaffirmed its previous policy regarding privileges for general practitioners and refused to make an exception in his case because he lacked sufficient training. Not satisfied with this ruling, he again applied to the executive committee for another hearing. At their meeting on April 20, it was voted to notify him he could have another hearing only if new evidence was available. As the result of a letter received on November 6, 1955, the executive committee voted on the 16th to hold a special meeting for him on the 21st. At this hearing the plaintiff presented his arguments, aided by a blackboard outline; stenographic notes were taken and copies of the transcription given to all members. At a subsequent executive session, the executive committee found no justification in directing the medical board to make an exception in his case.

On November 26, 1956, the plaintiff again wrote a letter requesting "restoration of the privileges of performing certain operative procedures under supervision which was withdrawn from me by order of the Medical Board in January, 1954." At the meeting of the medical board held on January 7, 1957, it was voted that unless he could produce evidence of additional training since the matter was last discussed, no favorable action could be taken. This action is also noted in the minutes of the executive board meeting of January 9.

From the above recital it becomes apparent the plaintiff had many hearings. That his claims were

meticulously presented appears from the steno-
graphic transcript of the November 21, 1955, hear-
ing. Much is made of the fact that "he had not been
notified or appraised of any charges against him;
and, in fact, none have been made or filed against
him." That, of course, is true. His high standing in
the community is not questioned by the board. He
has had success in his chosen profession, and the de-
cision of the board is no reflection on his skill as a
practitioner or his standing in the medical profes-
sion. He knew this and he also knew that in secur-
ing an accreditation it was necessary to improve the
quality of the medical and hospital care. Standards
had to be upgraded. General practitioners for the
most part had to limit their surgery and give way to
those who had special training and were certified as
diplomates of the American Board or those who had
qualified in their specialty but who had not as yet
been certified. The problem was one of special train-
ing in a limited field. Realizing this, he applied for
diplomate certification but was refused partly be-
cause of his not wanting to abide by their require-
ment that his practice be limited to one particular
field. As the result of all of these hearings, the
plaintiff knew that the reason or cause of the with-
drawal was the opinion of the medical board that his
prior training was insufficient to warrant full sur-
gical privileges. Several other members of the staff
were affected by the same ruling, but their status is
not in issue here.

In this action the plaintiff seeks to enjoin the de-
fendant from prohibiting him from performing the
operations in question, from excluding him from
performing them with the assistance of other sur-
geons, and from prohibiting other surgeons from
supervising or assisting him.

An action for injunctive relief is equitable in na-
ture. Whether or not a plaintiff is entitled to re-

lief is determined, not by the situation existing at the time of the alleged violations, but by that which is developed at the time of trial. *E. M. Loew's Enterprises, Inc.* v. *International Alliance,* 127 Conn. 415, 419. This action was commenced on March 18, 1957, and trial started January 7, 1958. The rules now in effect provide that appointments to the general staff shall be for one year and are restricted to those "who signify their willingness to abide by the by-laws, rules and regulations of the Griffin Hospital." The provision limiting curtailment of privileges does not appear in the 1957 by-laws. The plaintiff accepted an appointment under the 1957 by-laws, and also a reappointment for the calendar year 1958. Under article 7, the executive committee has the right to remove any member of the general staff or deprive any physician of the privileges of the hospital whenever, "in its sole judgment, the good of the Hospital or of the patients therein may demand it." The right of removal and appointments for only one year has long been recognized. *Levin* v. *Sinai Hospital,* 186 Md. 174, 180.

The change in the rules has not affected the plaintiff's right to practice medicine, his admissions to the hospital are nearly 50 per cent more than they were in 1953, and his professional income has increased proportionately. This negatives a showing of irreparable injury, an essential element in this type of action.

Judgment may enter for the defendant.