DARIUS M. MANLOVE, Administrator of the Estate of Darien E. Manlove, Plaintiff, v. WILMINGTON GENERAL HOS-

PITAL, a corporation of the State of Delaware, Defendant.

(*March* 21, 1961.)

TERRY, P. J., sitting.

*Joseph T. Walsh* for the plaintiff.

*Rodney M. Layton* (of Richards, Layton and Finger) for the defendant.

Superior Court for New Castle County, No. 1908, Civil Action, 1959.

TERRY, P. J.:

This is an action for wrongful death of Darien E. Manlove, an infant boy, filed by his father, Darius M. Manlove, as the administrator of his son's estate. The defendant, Wilmington General Hospital, has moved for summary judgment. The facts as disclosed from the record are briefly as follows:

Darien Manlove was but four months old when on the 4th of January, 1959, he became ill with diarrhea. He spent a sleepless night in considerable discomfort. The following day, January 5th, his parents contacted their family physician, Dr. Hershon, and were advised to administer certain medication which they had in their home. Throughout that day the child's diarrhea persisted, and he began to run a high temperature. Once again the parents called Dr. Hershon, who,

when he was advised of the fever, prescribed additional medication. That night brought no improvement, and so, on the following day, January 6th, the parents took their child to Dr. Hershon's office where he was examined and treated by Dr. Hershon's associate, Dr. Thomas. Upon returning home the child's condition did not improve, and on the morning of the 7th of January the parents concluded their child was getting worse and was in need of immediate medical care. However, the 7th was a Wednesday, and on Wednesdays Doctors Hershon and Thomas are not available at their office—at least not during the daytime hours. Not knowing where to turn, the parents decided to take their child to the Wilmington General Hospital, the place of his birth. They thought that at the hospital the child would receive the help and relief that he so desperately needed. They further assumed that the mere sight of a child so sick, together with their recitation of his aggravated discomfort, would suffice to prompt someone to give aid while there was still time. But this was not the case, for they failed to account for the formality of admission requirements.

The parents appeared before the nurse at her admissions desk in the Emergency Ward. They related the story of their child's illness and their doctor's treatment, and showed the medicine that had been prescribed. They further stated the child seemed to be failing, and requested that someone help him. The nurse apparently recalled her regulations to the effect that patients will not be admitted unless they present an admission slip signed by their physician. The nurse asked if they had such an admission slip and found that they did not. She stated that she would call the doctor's office. She did and discovered that the doctors were not available, whereupon she stated to the parents: "You have no admission slip signed by your doctor and our regulations do not permit us to treat your child under the circumstances, but you may come back to our Pediatric Clinic tomorrow and someone will look after your child at that time." At no time had the

nurse gotten up from her chair at the desk. At no time did she personally check the child. At no time did she make any effort to call an intern or staff physician, despite the fact that there were no patients in the Emergency Ward.

The parents, having been denied treatment for their child, returned to their home and called Dr. Hershon's office to make an appointment for that evening. However, they never kept their appointment, for at approximately three o'clock the same afternoon the child was found to be dead in his crib. Cause of death: bronchial pneumonia.

No one can dispute the magnitude of this tragedy. The thought most appalling to me is the denial of treatment to a suffering, possibly dying, child because a nurse blindly enforced an inapplicable regulation. I say inapplicable for the reason that the hospital did have a regulation which provided for treatment of all emergency cases. I would assume a person only a few hours away from death by bronchial pneumonia might be well classified as an emergency case.

This case presents a complex pattern of blurred tones, difficult to define. The hospital maintains that the nurse was not aware of the critical nature of the child's illness; that the parents had not made it manifest. Whereas, on behalf of the plaintiff it is argued that the mere recitation of the symptoms by the parents should have sufficed to indicate a critical condition, and that the nurse was completely indifferent. This is a question of fact, which can only be determined at trial. Yet, it must be said that the parents took their rebuff with what seems to have been a submissive resignation. Had they asserted their feeling in a more dogmatic attitude such would have defined the issue in a more positive manner and would probably have resulted in some sort of medical examination of their child. Were this to have occurred then this case may not have arisen, for it is reasonable to assume that a medical examination of the child would have revealed his illness for what it was, and, recognizing an emergency, all reasonable

medical steps would have been taken to provide relief. However, be that as it may, there is a defined area of factual dispute still involved. Plaintiff argues that this dispute removes the case from a positive posture for summary judgment; whereas, defendant contends that the facts that are at variance are immaterial.

Plaintiff has advanced a hypothesis by which the nurse's conduct may be viewed as possible misfeasance or malfeasance. He contends that the nurse made a superficial diagnosis upon the symptoms as related by the parents; that this was a shallow, ill-founded, and negligent diagnosis; that it was on this basis the nurse decided that no emergency existed, and that an intern's participation was unwarranted; that having reached this conclusion the nurse did not *per se* refuse treatment, but, rather, postponed treatment when she advised the parents that they could go to the Pediatric Clinic the following day. The plaintiff characterizes this conduct as being "negligent to the point of indifference." This analysis might seem to be the most safe approach, for it attempts to ground the hospital's liability upon the base of misfeasance. Though this might be the most conservative avenue for the plaintiff to follow, it has a certain difficulty. To reach the desired result I would be required to view the facts from a somewhat disturbing perspective and construe the passive inaction of the nurse as being in effect a negligent diagnosis. I think, however, that this would beg the issue. The nurse's conduct is more readily characterized as nonfeasance. Needless to say, the distinction between misfeasance and nonfeasance is often crucial, especially in tort law.

Defendant has adopted the position that the nurse's conduct was a case of nonfeasance from which it is argued that there can be no liability because there was no duty to to act, *i.e.*, no duty to treat, diagnose or admit. Therefore, defendant contends it is entitled to judgment as a matter of law. Assuming for the moment that the nurse's conduct is

to be characterized as nonfeasance, I will consider defendant's contention, *i.e.*, that defendant is not liable.

I shall begin with a definition of terms. The Wilmington General Hospital has been characterized as a "private, nonprofit, no stock, charitable hospital corporation." Though this might seem a very comprehensive definition, I find that the use of the adjective "private" gives rise to some degree of confusion. This is so because such hospitals have been classified both "private" and "public," depending upon the particular problems in issue. *Edson v. Griffin Hospital*, 21 *Conn. Sup.* 55, 144 *A.* 2d 341, 344.

Defendant is also an eleemosynary organization founded by private individuals pursuant to the corporation laws of this State. From this base its privacy is manifest. However, it exists to operate a nonprofit charitable hospital, generally recognized as being open to the public. Because it is so recognized it receives certain tax exemptions accorded to institutions which "promote the public welfare," pursuant to the provisions of Del. Const. 1897, Art. 8, Sec. 1, *Del. C. Ann.*, and 8 *Del. Code Ann.* § 501. It has also been the practice of our General Assembly to make outright appropriations on a per bed basis to various hospitals throughout the State, whereby defendant has received very sizeable subsidies. *For the current fiscal year the defendant has been made the recipient of $174,350 on the basis of its 317 beds.* 52 *Laws of Del.*, Chapter 159.

There can be no question that the Legislature has the power to grant these direct and indirect subsidies for such a corporation. *State v. City of Wilmington*, 3 *W. W. Harr.* 238, 134 *A.* 694. But, in order to sustain these benefits, the public aspect of the hospital must be emphasized. The hospital meets a public need, offers a public benefit, promotes the public welfare. It must also be noted that the above subsidization is given not to benefit a limited class, but to benefit

the entire community at large, rich and poor, because the community at large requires such general facilities.

Thus, it should be indisputably clear that the publicity of defendant's corporate purpose tends to greatly qualify the privacy of its corporate structure. But, caution must be exerted, for one may err if he attempts to overemphasize the public to the destruction of the private, and by the same token the private must not be overemphasized as to obscure the public. A balance must be struck, each case must be considered *sui generis* in light of the fact situation and the dictates of the law and sound policy. *Trustees of Dartmouth College v. Woodward*, 4 *Wheat.* 518, 4 *L. Ed.* 629.

It is obvious that defendant is in fact a private corporate entity, but that it exists to provide a public service, and its publicity is sufficiently prominent to justify direct and indirect governmental subsidies for the promotion of the public weal; while at the same time its privacy is also sufficiently prominent to justify judicial protection when usurpation threatens. The question then becomes, what emphasis must I place upon the public v. the private aspects of its nature in the case at Bar? Bear in mind that our facts only require us to treat those cases which purport to be emergencies. So, if I emphasize the public, is there a duty to treat? If I emphasize the private, is there a freedom to reject? Or, is there a duty to treat or a freedom to reject in either case?

Preparatory to answering these questions, I think it desirable to recapitulate defendant's argument. It begins with the proposition that there can be no liability for misfeasance without a duty of reasonable care, or for nonfeasance without a duty to act. This duty may arise by statute or common law. There being no allegation of statutory duty we must look to the common law. It is then argued that the applicable common law rule is "essentially identical with that governing the physician in his practice," namely, that he is under no

legal duty to accept any person for treatment, no matter how extreme the emergency and that no duty attaches to the physician until he has actually undertaken to administer treatment, at which point whether his services are rendered gratuitously or in expectation of payment the obligation to render reasonable care becomes fixed. 41 *Am. Jur. Phys. & Surg. P.* 135; 41 *C. J. S.* Hospitals § 8, p. 345; 26 *Am. Jur.* 593.

I refrain from passing upon the applicability, in this jurisdiction, of the common law duty of a physician to treat in cases of emergency, or a physician's standard of care in administering treatment. I shall only determine, in the light of defendant's argument, if an analogy may be justified between the common law duty of a physician and the duty of a hospital, such as the defendant, to treat in emergency cases. Assuming, without deciding, that a private physician may refuse to aid or treat in emergency cases it would seem logically to follow that an analogy might be justified in respect to a purely private hospital. However, such a similarity cannot be said to exist in respect to the defendant. The attempted analogy fails for the simple reason that the defendant's acceptance of direct tax benefits, together with financial subsidies from the State, has of necessity changed its characterization to that of a quasi public institution, thereby forfeiting to a measured extent the degree of privacy that it otherwise possessed.

It is abundantly clear to me that a hospital of defendant's character should be required at all times to render reasonable needed aid in those instances where an emergency involving death or serious bodily impairment might reasonably be said to exist. Of course, liability based on failure to fulfill this requirement is not absolute. The test is reasonableness. The law exacts of no one to do the unreasonable or the impossible. Legitimate exculpation is not to be excluded.

What I have said is an indication of my concepts of good morals and sound policy. The defendant has already recognized the moral premise by adopting an intra hospital regulation requiring treatment in all emergency cases. I am merely establishing the law in this State to be that which the defendant by its action has deemed to be good policy.

I am unable to conclude as a matter of law that no liability may be imposed on the defendant for nonfeasance in an emergency case. The quasi-public nature of the defendant's existence precludes such a holding. For the defendant to operate under a Delaware corporate charter; to receive benefits by tax exemptions, and to be the beneficiary of our public subsidies can only be justified if it serves the public welfare.

My conclusion does not deny the efficacy of plaintiff's claim based upon the theory of misfeasance. Plaintiff is free to follow either his misfeasance theory or his nonfeasance theory of recovery, or both.

Motion for summary judgment is denied.