**Floyd T. STANTURF, Plaintiff,**

v.

**Donald SIPES et al., Defendants.**

**No. 1211.**

United States District Court
W. D. Missouri,
St. Joseph Division.

Dec. 10, 1963.

Crichton & Morse, North Kansas City, Mo., for plaintiff.

J. D. James and David R. Odegard, of Houts, James, Randall, Hogsett & Mc-Canse, Kansas City, Mo., R. Leroy Miller, and Eugene E. Andereck of Pickett, Andereck & Hauck, Trenton, Mo., for defendants.

DUNCAN, District Judge.

The Plaintiff instituted this suit against the defendants as individuals and in their representative capacities, as set out in the caption of the plaintiff's Complaint. Recovery is sought in the sum of $350,000.00 actual and punitive damages for the alleged refusal of the defendants to admit the plaintiff to the Wright Memorial Hospital either as a paying or a charity patient.

Plaintiff seeks to vest jurisdiction in this court under the Fourteenth Amendment and under § 291 et seq., Title 42 U.S.C.A. designated as the "Hospital Survey and Construction Act", and more commonly known as the Hill-Burton Act. While there is no allegation in the Complaint that the hospital which is the subject of the controversy here was built with Hill-Burton funds, evidence in the case now before the court does reveal, that it was, and that phase of the case will be discussed hereafter.

Plaintiff alleges in his Complaint that on or about February 26, 1962, as a result of his automobile becoming stuck in a snow drift, he was caused to suffer severe exposure, and that the next day he sought admission to the Wright Memorial Hospital for treatment. He alleges that he was refused admission by the defendant Donald Sipes, who was acting as administrator of said hospital, and for and on behalf of all of the other defendants named in his Complaint.

He first sought admission through his doctor as a charity patient, and having been refused admission as such a patient, the following day he sought to be admitted as a pay patient, and again was refused, even though he alleges he was in position to underwrite and guarantee any and all medical expenses incident to his admission to the hospital.

He further alleges that several days thereafter he was admitted to another hospital, and subsequently it was necessary to amputate both of his legs, and he attributes this injury to the failure of the defendants to admit him to the Wright Memorial Hospital. For this he seeks actual damages in the sum of $250,-000.00 and punitive damages in the sum of $100,000.00. The defendants have filed a Motion to Dismiss, as follows: [Caption omitted]

"Come now the defendants, each and all of them, corporate, institutional, and individual, and move the Court for an order dismissing plaintiff's complaint on the ground that it fails to state a claim upon which relief can be granted. Defendants

submit the following reasons in support of their motion:

"1. Wright Memorial Hospital exists and is operated as a non-profit organization for purely charitable and benevolent purposes, and for that reason it, its corporate trustee, Trenton Trust Company, the Board of Directors or General Staff of the Wright Memorial Hospital, the members of the Board of Directors of the Trenton Trust Company and all individual defendants who are members of these groups are immune from liability for any tort arising out of the operation of said charitable institution unless the individual defendants were personally negligent.

"2. None of the defendants, institutional, corporate or individual, were guilty of negligence under the facts alleged in plaintiff's petition, since they owed no duty to plaintiff to admit him to said Wright Memorial Hospital as a patient, charitable or otherwise.

"3. There is nothing contained in the Fourteenth Amendment of the Constitution of the United States or the Hill-Burton Act, or its amendments, referred to in plaintiff's complaint, placing upon any defendant, institutional, corporate or individual, a duty to admit plaintiff to Wright Memorial Hospital as a patient, charitable or otherwise.

"AND ON THIS MOTION, defendants pray the order of the Court."

The motion alleges that the Complaint fails to state any ground upon which relief can be granted and that the Wright Memorial Hospital is operated as a non-profit organization for purely charitable and benevolent purposes, and for that reason its corporate Trustee, the Trenton Trust Company, the Board of Directors or General Staff of the Wright Memorial Hospital, the Members of the Board of Directors of the Trenton Trust Company and all individual defendants who are members of those groups are immune from liability for any tort arising out of the operation of the charitable institution unless individual defendants are personally liable.

In view of the fact that there is nothing in the Complaint to indicate that the hospital was built by Government funds, or by a grant in aid by the Government under the Hill-Burton Act, to determine whether or not the case should be dismissed, we must look to the Request for Admissions, the answers to the Requests for Admissions, the answer to interrogatories and to the depositions which have been taken and are on file and are before the court.

According to the information at hand, the trustees of the Wright Memorial Hospital obtained a grant through the state agency of Missouri under the Hill-Burton Act for approximately $290,000.-00 for the purpose of constructing the hospital. The Wright Memorial Hospital came into being as a result of an irrevocable trust agreement dated September 20, 1932, between Dr. J. B. Wright of Trenton, Grundy County, Missouri, and the Trenton Trust Company, a corporation, of Trenton, Missouri.

The court will examine the status of the Wright Memorial Hospital under its original trust agreement, and also the effect upon that status of the receipt of Federal funds under the Hill-Burton Act. The ultimate determination for this court must be whether or not the court has jurisdiction to hear this case.

Let us then examine first the nature of the trust itself. The trust agreement reveals that at the time it was made, the grantor was the owner of a private hospital situated in the City of Trenton, Grundy County, Missouri, known as the "Wright Hospital", and that he desired to establish a charitable hospital for the benefit of the citizens of Grundy County, and particularly of the City of Trenton, suitable for a training school for nurses and for the gratuitous treatment of the medical and surgical diseases of the sick poor of said city and county.

To carry out his purpose he transferred to the trustee, certain real estate

and other property therein described. He provided that said property or equipment or the proceeds thereof, if sold as provided in the trust agreement and the investments and reinvestments thereof, should forever constitute and be a trust fund for such charitable uses.

The hospital was to be known as the Wright Memorial Hospital in memory of Eva Wright, "beloved wife" of grantor, "now deceased".

The trust agreement provided that the title to the hospital and all other property transferred to the trustee under the trust, except as otherwise provided, should, at all times remain in the name of the trustee, subject to the terms of the agreement, but the actual management, supervision and operation of the hospital and other real property held thereunder should be left to a "General Staff"; that such management, supervision and operation of said Memorial Hall shall be subject to the approval of the trustee.

It was provided that the General Staff should consist of not less than five nor more than seven members, who should serve without pay and at least a majority of whom should be physicians, surgeons, nurses or internes selected from the regular profession as such in the State of Missouri, preferably from Grundy County. Such staff was required to hold meetings at stated intervals and that a majority should control any vote.

The first general staff was to be appointed by the trustee with the advice and consent of the grantor, and due to his familiarity with the affairs of the hospital, the grantor was to serve as one of the members of such staff so long as he lived and desired to serve as such.

The members of the staff were to serve so long as they lived or resigned or until removed by the trustees, as provided, except that no trustee was to serve beyond the age of 70 years. Vacancies were to be filled during the lifetime of the grantor by the trustee with the advice and consent of the grantor, and after his death by the trustee alone.

The general staff was empowered to employ such assistants, agents, physicians, surgeons and nurses as deemed necessary to properly and efficiently operate the hospital, and to pay them such remuneration as reasonable and necessary, keeping in mind however, the desire of the grantor that the expenses incident to the operation of said hospital should be minimized as far as possible without impairing the efficiency and effectiveness of said hospital; to the end that as many free patients as possible might be served and as much good as possible be accomplished by the hospital.

The general staff was given full and complete charge of the affairs of the hospital including the collection of all income that in any way was derived from the operation of the hospital or that may have been received from any source whatsoever for the use of the hospital.

It was provided that the staff could accept pay patients and collect the usual charges from such patients, but all income thus obtained should be used for the maintenance and improvement of said hospital and to give free hospital treatment to the poor sick of Trenton, and Grundy County.

It was reiterated in paragraph 5 of the trust agreement that: "The purpose of this trust is to give free hospital, surgical and medical care to as many poor sick of the City of Trenton, Missouri, or of Grundy County, Missouri, as possible".

The general staff was given the power to decide what poor sick should be accepted by the hospital, but in reaching such decision they were not required to accept as free patients any one who was able partly or wholly to pay his or her expenses, it being the desire of the grantor that only the poor sick who were bona fide wholly unable to pay the costs of hospitalization and medical care be admitted as free patients.

The trust agreement specifically provided that: "in the selection of poor sick the general staff shall not discriminate because of sex, creed, or social position."

It was further provided that out of the income the general staff should pay all expenses of operating, maintenance and administration of the hospital, and of the Eva Wright Memorial Hall, and in this paragraph it was also provided that a reasonable fee was to be paid to the trustee.

In case of the destruction of the hospital facilities by fire, the trustee was authorized to sell the . property (real) and to acquire other property and replace buildings thereon if in its judgment it saw fit to do so.

The trustee was authorized, if it felt it desirable, to organize or cause to be organized an eleemosynary or charitable organization or corporation under the laws of the State of Missouri.

The instrument further provided that should this action be taken by the trustee, it should designate the officers, directors and/or trustees of such corporation or association with the advice and consent of the grantor during his lifetime or without the advice and consent of any person or organization, if grantor be deceased, and that after the formation of such association or corporation, it should assume the control and management of the hospital in place of the general staff, and such corporation or association through its directors, officers and/or trustee, should have all the powers and duties, subject to all the limitations and liabilities given or imposed upon the general staff.

Further evidencing the intention of the grantor, it was provided that in the sole discretion of the trustee the location of the hospital might be changed to another site chosen, and the trustee was given full power and authority to sell, exchange, or otherwise dispose of the hospital grounds and buildings then erected thereon for such amount and upon such terms and conditions as it deemed best, and to use the proceeds for the acquisition of other property for the same purposes.

Finally, the grantor provided that the trustee should be responsible only for reasonable diligence in the performance of its duties, and should not be answerable in any case for the act or default of the general staff or any corporation or association formed as hereinabove provided, or for the act or default of any of their agents, attorneys or employees selected by the trustee with reasonable discretion.

And in this last paragraph it is provided that the trustee should be entitled to be reimbursed from the trust estate for proper outlays of every sort and nature by it incurred in the discharge of its trust.

There is no record before the court indicating how the trust was administered from the time of the execution of the trust instrument until 1956, but it may be assumed from the records, that it did operate under the terms of the agreement until 1956, when it first received Hill-Burton funds. The circumstances under which it received such funds and the amount thereof have not been made available to the court.

Having discussed the trust instrument under which the Wright Memorial Hospital operated, the court will now consider the Hill-Burton Act, under which Federal funds were received.

The Hill-Burton Act was enacted by the Congress July 1, 1944, c. 373, Title 6, Chapter 601 as amended August 13, 1946, c. 958, § 2, 60 Stat. 1041 as amended October 25, 1949, c. 722, § 6, 63 Stat. 900, July 12, 1954, c. 471, § 4(a), 68 Stat. 464. That part of the Act with which we are concerned, includes §§ 291 through 291n of Chapter 6A United States Code.

§ 291(a) provides for assistance to the several states to inventory their existing hospitals, survey the need for the construction of hospitals and to develop programs for the construction of such public and other non-profit hospital as will in conjunction with existing facilities, afford the necessary physical facilities for furnishing adequate hospital, clinic and similar services to all people.

(b) provides assistance in the construction of public and other non-profit

hospital in accordance with the program. (c) authorizes the Surgeon General to conduct and make grants for the conduct of research experiments and demonstrations relating to the effective development and utilization of hospital services and facilities, and to promote the coordination of such experiments and demonstrations and the useful application of their results.

§ 291a authorizes the appropriation of $3,000,000.00 for the purpose of carrying on the survey provided for in § 291. The allocation of funds provided for in the Act was to be made to the states, and in order to avail themselves of its benefits, it was necessary for the states to set up a state agency as the sole agency for carrying out such purposes. The state agency was subject to approval by the Surgeon General and any application made by the state agency for the purpose of carrying on the survey as provided in § 291 for the funds appropriated therefor were subject to approval by the Surgeon General.

The Act authorized the appropriation of $150,000,000.00 annually beginning in 1950 for a period of nine years for the construction of public and other nonprofit hospitals under the authority of § 291d, i. e., "[T]o assist in the construction of public and other nonprofit hospitals in accordance with such program." The funds so appropriated were to be used for making payment to states which had submitted and had approved by the Surgeon General state plans for carrying out the purposes of said section 291(b), and for making payments to political subdivisions and/or other nonprofit agencies in such state.

The Act, § 291e further provided that the state plan should provide for adequate hospital facilities for the people residing in the state without discrimination on account of race, creed or color, and should provide for adequate hospital facilities for persons unable to pay therefor. This section further provided that:

"Such regulation may require that before approval of any application for a hospital or addition to a hospital is recommended by a State agency, assurance shall be received by the State from the applicant that (1) such hospital or addition to a hospital will be made available to all persons residing in the territorial area of the applicant, without discrimination on account of race, creed, or color, * * *."

Certain exceptions were made in cases where separate hospital facilities were provided for separate population groups. It will be noted that the assurances which are required of the applicant are to be received by the State agency and not by the Federal Government. This applies both to the questions of race, creed and color, and to the availability of facilities for charity patients.

There are two instances to be found in the Act which would confer jurisdiction upon the Federal court to determine any questions arising under the Act. One is found in § 291h(e), which provides that if any of the institutions or facilities which have availed themselves of the benefits of the Act shall cease to function as such, then the *United States* shall be entitled to recover from either the transferor or transferee of the property which has enjoyed the benefits of the grant in the United States District Court, an amount equal to the proportion of the Government's contribution to the total value of the property.

The other instance is found in § 291j (b) where jurisdiction is vested in the United States District Court to pass upon appeals filed by the *State agency* against the Surgeon General upon denial of an application.

None of these sections bestows upon the borrower or the applicant any right of appeal under any circumstances, or any right of action with respect to a grant or to the use of the facilities which have come into existence as a result of a grant.

The first application for Hill-Burton funds with which we are concerned is dated February 21, 1961. That is the first application that the court is aware

of, being before the court as Plaintiff's Exhibit I. This application gives the name of the applicant as the Wright Memorial Hospital, Trenton, Grundy County, Missouri. It is described as a general hospital with 26 existing beds. The new facility to be constructed under the Act would add 24 beds, making a total of 50.

It was estimated that the total cost of the construction and contingencies would be $175,000.00. This figure was a total of construction costs, equipment, and site-survey of soil investigation. The application indicated the availability of $105,000.00 in liquid, assets, and that the Federal share of the estimated costs would be $70,000.00. The application stated:

"That, when the project is completed, it will be operated and maintained in accordance with the minimum standards prescribed by the State Agency for the maintenance and operation of such facilities" and

"That the facility will provide reasonable volume of free patient care".

In connection with the application, the State Agency certified that the applicant was a voluntary non-profit institution, that:

"The applicant's property is included in the project Construction Schedules submitted to the Public Health Service." That:

"The applicant has given adequate assurance the facility will be operated without discrimination because of race, creed or color," and lastly,

"The applicant has given assurance that a reasonable volume of free patient care will be provided in the proposed facility."

It is further provided that the Federal share, [$70,000.00] for this project was to be charged to the allotment to the state for the fiscal year 1961.

A second application was dated June 21, 1962, and the legal name of the applicant was the Wright Memorial Hospital, Trenton Trust Company, trustee, Trenton, Grundy County, Missouri. Again the facility was described as a general hospital, present bed capacity of 26, provided for construction of the new facility of 24; total suitable after construction 50. Construction contracts and contingencies in this application were placed at $190,359.71. Equipment costs were $19,717.78, and architect's fee $11,421.97, for a total of $221,499.46.

The Government was requested to participate in $220,000.00 of that amount. Thus the Federal share of the estimated cost was $110,000.00.

Apparently the second application was simply a supplemental one, necessitated by increased costs of construction, as the application reveals that only $110,000.00 was allotted from Federal funds, $105,-000.00 of this allocated to the fiscal year 1961, and $5,000.00 to the fiscal year 1962. Under the first application there was an allocation of $70,000.00 which would mean that under the second application there was an allocation of $40,-000.00.

The State Agency certified that this application met all of the requirements of the State plan, that the plans and specifications were in accordance with the regulations promulgated by the Surgeon General under the Federal Act, and that it contained reasonable assurances as to title, payment of prevailing rates of cost of construction, and of the entire cost of maintenance and operation when completed. Assurances were included that the operation of the facility would be in conformity to State standards as to operation and maintenance, and to all applicable State laws, state and local codes regulations, and ordinances.

The state agency agreed that it would periodically inspect the project; that it would certify to the Surgeon General for payment such sums as were found to be payable under the Federal Act. The application was approved by the Surgeon General.

This, in essence, was the procedure followed by the defendant hospital in

obtaining funds under the Hill-Burton Act.

Putting aside any consideration of the Hill-Burton Act, or the effect of the receipt of Federal funds thereunder, what is the status of the Wright Memorial Hospital under its trust agreement?

■ Even a casual reading of the trust agreement dispels any doubt as to the grantor's intention in establishing the trust. The trust was created to establish and maintain a hospital for the benefit of citizens of Grundy County, Missouri, and in particular for citizens of Trenton, located in that county. Those who could not afford to pay, as well as those who were financially able, were included in the grantor's plan of affording hospital benefits to the people of the area described.

The hospital is the creation of a private citizen, and is operated under a private trust by private citizens. There is no question but that the institution of the trust was for charitable benevolent purposes. The Wright Memorial Hospital meets the tests in Adams v. University Hospital, 122 Mo.App. 675, 99 S.W. 453 for a charitable institution. [This case was reaffirmed in 1961 by the Mo.S.Ct. in Schulte v. Missionaries of La Salette Corp. of Mo., 352 S.W.2d 636]. Therefore, it cannot be contended that the Wright Memorial Hospital, *under the terms of the trust agreement* is not a private charity under the law of Missouri.

Therefore, the question that this court must decide is whether or not the acceptance of funds under the Hill-Burton Act by the trustee in the expansion of the hospital facilities so changed the private, charitable nature of the trust and made of it a Federal agency so as to confer jurisdiction on this court.

■ The plaintiff advances the rather unique theory that when the trustee made application through the State Agency for Hill-Burton funds, and its expressed agreement in the application to abide by the terms and regulations necessary to obtain such funds, and the acceptance of the application and the payment of the funds by the Surgeon General, it created a contractual relationship between the Government and the applicant that was for the benefit of third persons, i. e., all those persons who might become eligible for admission to the hospital as charity patients, and that any failure of the Wright Memorial Hospital to live up to the terms of such a contract would render the facility liable in an action in the Federal court.

No authority has been cited to sustain this position nor have I been able to find any. I must therefore, rule this contention against the plaintiff.

That brings us to the final question of whether or not the acceptance of the Hill-Burton funds rendered the Wright Memorial Hospital a public institution or a Federal agency, which would confer jurisdiction on the Federal court to hear and determine the controversies growing out of its management and operation.

■ It is the general rule of law, which I think will not be disputed, and does not require citation of authorities, that ordinarily the granting of funds, or, shall we say, the contribution of funds by either a state, county or municipality to a privately owned or operated charity or trust, does not make of it a public charity or trust, does not change the nature and character of its operation, nor does it give to any such contributing source, the right to manage or control the operation of the charity.

Further, it does not give rise to any cause of action to third persons for injury or damage that may be sustained as a result of the operation of the charity by its private operators.

Before discussing the effect of the Federal contribution to the building and operation of this hospital, let us refer to the very definite and specific provisions of § 291m of the Hill-Burton Act. It is stated:

"Except as otherwise specifically provided, nothing in this subchapter shall be construed as conferring on

:any Federal officer or employee the right to exercise any supervision or control over the administration, personnel, maintenance, or operation of any hospital, diagnostic or treatment center, rehabilitation facility, or nursing home with respect to which any funds have been or may be expended under this subchapter."

We must assume therefore, that regardless of any funds which have been contributed by the Government, that this section of the statute was written purposefully, and it very clearly establishes that the Federal Government did not intend to have any influence whatsoever in the operation of any hospital brought into existence through a grant under the Hill-Burton Act. Had it been otherwise, unquestionably the Congress would have said so. The Congress was careful to spell out the circumstances and conditions under which the Government through the Surgeon General of the United States could recover either through the State Agency or directly from the applicant under certain specific circumstances, the amount its allotment or the proportionate part of the allotment bore to the whole of any proceeds resulting from the liquidation of the project.

There is no suggestion in any section of the statute that jurisdiction is conferred upon the Federal court to try any case or to entertain jurisdiction in any litigation that might arise out of the operation of the hospital, except that which is specifically granted under the statute. It must be assumed from a reading of the statutes, that the Surgeon General placed a burden upon the State Agency to see that the hospital facilities that were created as a result of these grants were carried out in accordance with the spirit of the Act.

In the instant case, the Government, so far as the record reveals in the case (i. e., depositions, pleadings and the briefs), has never attempted to exercise any control whatsoever over the management of the facilities by the trustee as provided in the trust agreement.

The distinctions between public and private corporations and between public trusts and private trusts are discussed at great length in Dartmouth College v. Woodward, 4 Wheat 518, 17 U.S. 518, 4 L.Ed. 629 (1819). This significant language is used at l. c. 663 of 17 U.S.:

"There is not a case to be found which contradicts the doctrine laid down in the case of Phillips v. Bury, viz., that a college, founded by an individual, or individuals, is a private charity, subject to the government and visitation of the founder, and not to the unlimited control of the government."

Mr. Justice Story in his concurring opinion at page 668 of 17 U.S. says:

"If, therefore, the foundation be private, though under the charter of the government, the corporation is private, however extensive the uses may be to which it is devoted, either by the county of the founder, or the nature and objects of the institution. * * *"

Further at page 670 of 17 U.S., Mr. Justice Story continued:

"When, then, the argument assumes, that because the charity is public, the corporation is public, it manifestly confounds the popular, with the strictly legal, sense of the terms. And if it stopped here, it would not be very material to correct the error. But it is on this foundation, that a superstructure is erected, which is to compel a surrender of the cause. When the corporation is said, at the bar, to be public, it is not merely meant, that the whole community may be the proper objects of the bounty, but that the government have the sole right, as trustees of the public interests, to regulate, control and direct the corporation, and its funds and its franchises, at its own good will and pleasure."

In Edson v. Griffin Hospital, 21 Conn. Sup. 55, 144 A.2d 341, 343, (S.C.Conn.

1958) the court defined a private hospital as:

" * * * one founded and maintained by private persons or corporation, a state or municipality having no voice in the management or control of its property or the formation of rules for its government. * * * courts will not interfere with the internal management of a private corporation. Questions of policy and management are left solely to the honest decisions of the officers and directors, and the court is without authority to substitute its judgment for theirs. The same rule applies to private hospitals. * * * "

We have been able to find but two cases where the exact question now presented to the court was involved. In Simkins v. Moses H. Cone Memorial Hospital, 211 F.Supp. 628, (M.D.N.C. 1962), an action, brought by Negro citizens for declaratory and injunctive relief, alleged that the hospitals which had been constructed with Hill-Burton funds, were discriminating against doctors, dentists and others because of color. The hospitals performed the usual functions and were private institutions. The court there defined private hospitals, and quoted from Khoury v. Community Memorial Hospital, Inc., 203 Va. 236, 123 S.E.2d 533 (1962) as follows:

" 'We next turn to the question of whether the use of federal and state funds for construction thereby constituted the hospital a public corporation.

" 'The distinctions between a public and a private corporation have been so carefully drawn and so long recognized that we experience no difficulty in answering the question in the negative.' "

Continuing:

" 'The hospital is not owned by the federal or the state government, albeit federal and state funds may have made its construction possible. It is not an instrumentality of government for the administration of any public duty, although the service it performs is in the public interest. Its officers are not appointed by and are not representatives of government, notwithstanding that their authority stems from legislative enactment. Under these circumstances, the hospital falls squarely within the time-honored definition of a private corporation.' "

As to the management of the hospitals, the Court said this:

"Both hospitals are effectively managed and controlled by a self-perpetuating board of private trustees. No public agency has the power to exercise any supervision or control over the management or operation of either hospital. Neither hospital is required to discriminate against any citizen because of race, and no right to do so is claimed by either hospital by reason of its agreement with the Surgeon General of the United States and North Carolina Medical Care Commission. Under these circumstances, it cannot be said that the defendants waived their privacy by accepting Hill-Burton funds."

In conclusion, the Court stated:

"1. The various contacts the defendant hospitals have been shown to have with governmental agencies, both federal and state, do not make them instrumentalities of government in the constitutional sense, or subject them to either the Fifth Amendment or the Fourteenth Amendments to the United States Constitution.

"2. The defendants are private persons and corporations, and not instrumentalities of government, either state or federal, and none of the defendants are subject to the inhibitions of the Fifth Amendment or the Fourteenth Amendment to the United States Constitution.

"3. This action is one brought by individuals seeking redress for the

alleged invasion of their civil rights by other individuals or private corporations, and this Court has no jurisdiction over the subject matter of the action."

The question of whether or not the contribution of Federal funds under the Hill-Burton Act rendered or constituted a hospital a public agency or instrumentality of the Government, was before the Supreme Court of Virginia in Khoury v. Community Memorial Hospital, Inc., supra. The hospital in that case was a non-stock, non-profit corporation chartered pursuant to the laws of Virginia, to:

"* * * establish, construct and maintain a regional hospital for the counties of Mecklenburg, Brunswick and Lunenburg, Virginia, to be located at South Hill * * * for the treatment, healing and care of ill, wounded, disabled and diseased persons. * * *"

Funds for the construction of the hospital were derived from the Commonwealth of Virginia from local subscriptions and under the Hill-Burton Act from the government. The issue arose in this case over the expulsion as a member of the staff of a physician. The court stated at l. c. 538 of 123 S.E.2d:

"The evidence does not disclose that any conditions were attached to the funds contributed by the Commonwealth to the hospital. The only conditions connected with the federal funds were that the hospital was required, before obtaining such funds, to give assurances that it would treat certain indigent patients free of charge and that no person would be denied admission because of race, creed or color. These conditions are completely insufficient to convert the hospital into a public hospital. In fact, the Hill-Burton Act itself provides: * * *."

And here the Court quoted § 291m of the Act which prohibits the Federal Government from exercising any supervision whatsoever of a hospital that is constructed partially by Hill-Burton funds.

In holding that the Board of Trustees were within their rights in excluding the physician, the Court stated:

"We are of the opinion that when the trustees of a private hospital, in their sound discretion, exclude a doctor from the use of the facilities of the hospital, the courts are without authority to nullify that discretion by injunctive process. There are no constitutional or statutory rights of the doctor, or of his patients who wish to be treated in the hospital by him, which warrant such interference." * * * (Citing cases.)

The Wright Memorial Hospital under the terms and conditions of the trust instrument, under which it was authorized, was a private institution, a private charity, and the acceptance of Hill-Burton funds through the State Agency, granted by the Federal Government, did not render it a public or a governmental institution that would give this court jurisdiction to determine controversies over the violation of any of the conditions under which the grant was made.

Whether or not it was a charitable institution at the time of the refusal to admit the plaintiff is not for this court to say. We are concerned here only with the question of whether or not the granting of Hill-Burton funds subjected it to Federal control thus confering jurisdiction on this court. If it did not, then the plaintiff had no cause of action under the Fourteenth Amendment, which does not deal with controversies between private individuals and this court could not entertain an action brought against the hospital.

Upon consideration of all the foregoing, the court finds that the controversy is one between private entities.

There is no diversity of citizenship, and there is no jurisdiction conferred upon this court for the type of controversy in question by the Hill-Burton Act itself.

**894**

Since the Fourteenth Amendment is not concerned with the controversies of private citizens among themselves, no federal question exists or could be raised which would enable this court to hear the case at hand.

The Complaint is therefore dismissed for lack of jurisdiction over the subject matter, without prejudice to any right the plaintiff might have to seek recovery elsewhere in a court of competent jurisdiction.