[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: PERMANENT INJUNCTION
This case came to this court as an Application for a Temporary Injunction. The parties agreed that the temporary hearing would be the permanent hearing and accordingly the court is ruling on the permanent injunction. The parties have submitted a joint statement of undisputed facts dated February 2, 1996, which is attached hereto and found by the court to be true.
Both parties agree that in order for the plaintiff to prevail on the extraordinary remedy of a permanent injunction, the plaintiff must show (1) she has a reasonable probability of success on the merits; (2) she is subject to imminent, substantial and irreparable harm; (3) she has no adequate remedy at law and (4) the balance of equities favors the plaintiff.
This court finds the plaintiff cannot demonstrate the probability of success on the merits.
This court finds that the hospital's decision to terminate the plaintiff for unsatisfactory performance, made in good faith, is not subject to judicial review.
The hospital and its doctors are uniquely qualified to judge CT Page 2576 the qualifications and competency of resident physicians. The hospital has determined the plaintiff is unfit for the practice of OB/GYN medicine. The hospital's decision is subject to review only if arbitrary, capricious or in bad faith. This court cannot find that that standard has been met by the plaintiff.
A private hospital has the authority to appoint and remove members of its medical staff in its discretion. The action of the trustees is final in such matters. A court may not substitute its judgment for the judgment of the hospital trustees, unless the trustees acted arbitrarily, capriciously or unreasonably. The courts are also to abstain from reviewing school decisions on academic qualifications.
 ". . . it is a fundamental and generally accepted rule that courts will not interfere with the internal management of a private corporation. Questions of policy and management are left solely to the honest decisions of the officers and directors and the court is without authority to substitute its judgment for theirs. The same rule applies to private hospitals. 26 Am.Jur. 592 § 8. Edison v. Griffin Hospital, 21 Conn. Sup. 55, 59, 144 A.2d 341 (1958)."
In Edison, the plaintiff sought to enjoin the defendant Griffin Hospital from prohibiting his performance of certain operations, from excluding him from performing them with the assistance of other surgeons, and from prohibiting other surgeons from supervising or assisting him. After a hearing his privileges were denied.
In Khan v. Suburban Community Hospital, 45 Ohio St.2d 39,340 N.E.2d 398 (1976), the Appellate Court found that Dr. Khan was legally licensed to perform general surgery, and did so completely at the defendant hospital for approximately four years. They found that to exclude him from further practice merely because he had not attained membership in certain medical organizations, was arbitrary, capricious and unreasonable.
The Supreme Court reversed the Appellate Court holding:
 "By so concluding for the reasons stated, the Court of Appeals strayed into a morass of error. It is the board, not the court, which is charged with the responsibility of providing a staff of competent physicians. The board CT Page 2577 has chosen to rely on the advice of its medical staff and the court may not surrogate for the staff in discharging this responsibility. . . . the court is charged with the narrow responsibility of assuring that the qualifications imposed by the board are reasonably related to the operation of the hospital and fairly administered. In short, so long as staff selections are administered with fairness geared by a rationale, compatible with hospital responsibility, and unincumbered with irrelevant considerations, a court should not interfere. . ." Id., at 43-44. (See cases cited therein).
The court finds that the evidence taken as a whole demonstrated to Doctors Nelson, Ginsberg and Sullivan that the plaintiff violated the hospital's standards of patient care by falsifying patient records, failing to take proper action to evaluate the "Chang" patient, falsifying the acts of patient physical examinations and mistreating patients on a personal basis.
Doctors Nelson, Ginsberg and Sullivan believe the plaintiff constitutes a danger to patients should she be allowed to finish the Stamford OB/GYN residency program. Doctors Nelson, Ginsberg and Sullivan claim their opinion is justified by the plaintiff's falsifications, omissions and mistreatment shown at trial and in their investigation.
Each of the incidents that directly led to plaintiff's termination was investigated by Doctors Nelson, Ginsberg and Sullivan with findings that corresponded directly to those adduced in open court during the course of the trial proceedings.
The plaintiff's contract with the hospital provides for termination for commission of the offenses for which she was found responsible. The hospital is a private institution such that plaintiff was not entitled to procedural due process beyond that provided for in her contract with the hospital. The court does find that despite the lack of any requirement for a hearing on her case, the hospital along with Doctors Nelson, Ginsberg, Sullivan and Mr. Michael Staples, did afford the plaintiff a hearing on the claims against her. The plaintiff was permitted to present her side of each of the claims against her, both upon the happening of each of the events that led to her discharge and at her final hearing on January 12, 1996. The plaintiff's discharge was justified and supported by the facts and law applicable to this case. CT Page 2578
There is no dispute about the pertinent facts of the Chang incident. Essentially, the plaintiff should not have relied on Doctor Chang's evaluation of a patient in an unusual situation without conducting her own evaluation in her capacity as senior resident. The reason for having a senior resident on the floor was to insure that matters were properly evaluated and either handled directly or passed on to the attending physician for assistance. The major claim is that the plaintiff's failure to respond properly to the situation was the breakdown in the patient care chain.
On August 8th, a second incident occurred which led to the plaintiff's ultimate discharge. She sent a patient who was not pregnant up to the prenatal testing unit to have an ultrasound performed to document fetal viability. Doctors Nelson, Ginsberg and Sullivan concluded that the plaintiff had deviated from the acceptable standard by failing to examine the patient, and by sending non-pregnant woman for tests. They further determined that the plaintiff falsified the patient's chart. They came to these conclusions after talking to both the plaintiff and the patient involved. The plaintiff denied that she had done anything wrong or failed to do anything that should have been done. It is of great importance to this court that an investigation was conducted and they concluded that the plaintiff was not telling the truth. Doctors Nelson, Ginsberg and Sullivan reached this conclusion both at the time of the investigation, and later at her January 12, 1996 hearing. The key to this incident is that information concerning fetal heartbeat was filled in on the chart. Doctors Nelson, Ginsberg and Sullivan concluded that it was the plaintiff who filled in this information. In August she was placed on probation, and advised that failure to comply would result in termination. (See Exhibit #7).
The Evans incident occurred on December 13, 1995. The plaintiff testified that she had given patient Gregg an examination, although not a pelvic exam. Rather than do her own pelvic exam, the plaintiff relied on Doctor Evans' nurse's report of cervical dilation in deciding on treatment. There was evidence that the patient had told her doctor that she had never received a physical examination of any kind at the hospital. This information directly contradicted what Doctor Fagan had put on the chart and what she had testified to in court. Again, Doctors Nelson, Ginsberg and Sullivan concluded that the plaintiff had not done an examination on the Evan's patient, and that she had falsely testified concerning another patient record. CT Page 2579
Doctors Nelson, Ginsberg and Sullivan indicated that they did not reach a final decision on this matter until the final three incidents were brought to their attention. These were the Bruno letter (Exhibit B), the Holdsworth letter (Exhibit #12), and the Waddle Telephonic Complaint, all of which arose during the first week of January 1996. The Evans matter was concluded on January 9th when Doctor Evans gave a written statement of his complaint (Exhibit #27).
The complaint of Ms. Bruno was confirmed by Doctor Jennifer Corey, and the complaint of Ms. Holdsworth was confirmed by Doctor Kessler. Doctor Fagan denied any mistreatment. It was reasonable for Doctors Nelson, Ginsberg and Sullivan to believe Ms. Bruno and Ms. Holdsworth over the plaintiff.
Sharon Waddel testified in court she was unable to directly confirm the plaintiff's voice made the offensive remarks. However, Doctor Spencer Richlin testified that he heard the plaintiff make the remarks. Although the plaintiff denies making the remarks, it was reasonable for Doctors Nelson, Ginsberg and Sullivan to conclude that she made them.
In deciding this case the court has considered the investigation into the incidents, the progressive discipline imposed, and the final hearing afforded Doctor Fagan. To this court there are two significant points. First, while there was some confusion as to who carried out the investigation of what issues, it was clear that in each case the concerned parties were contacted and Doctor Fagan was allowed to respond. Also, the claims at court were substantially similar to the documents presented concerning the claims against the plaintiff. Second, the court must consider the employment contract itself. The court finds the contract to be the single page introduced as Exhibit #5. The plaintiff was subject to the requirement that she perform her duties "satisfactorily." It is clear that Doctors Nelson, Ginsberg and Sullivan were not satisfied with the plaintiff's performance.
In closing, this court finds this decision to have been one of the most difficult it has ever made. The court finds its standard of review dictates that it should not interfere with the medical judgment of Doctors Nelson, Ginsberg and Sullivan unless it was exercised arbitrarily, capriciously or unreasonably. It seems to this court that all of the people involved with the plaintiff were attempting to do their best under all the circumstances. What is CT Page 2580 clear is that when all was said and done Doctors Nelson, Ginsberg and Sullivan determined the plaintiff had lied and falsified records. The doctors believed this determination, in and of itself, was sufficient to terminate the plaintiff. Doctor Krane's testimony about charts and their falsification was not the opinion of Doctors Nelson, Ginsberg and Sullivan. The court cannot find their exercise of judgment was an abuse of discretion or unreasonable. Should there be a better procedure in place? In the court's opinion, yes. The Hospital should take a long hard look at what they have done. Doctors are not trained in investigating. Perhaps Doctor Shiffer, who brought the plaintiff on board, should have been consulted. He is of the school that if your child makes mistakes, you correct them but don't kick them out of the house. The court finds that the decision of the hospital should not be interfered with by this court and the application for a permanent injunction is denied.
KARAZIN, J.